UNITED STATES of America, Plaintiff,

v.

**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants.**

**In the Matter of the Application of CAPITAL CITIES/ABC, INC., CBS Inc. and National Broadcasting Company, Inc., Applicants,**

**For the Determination of Reasonable License Fees for Their Owned Television Stations.**

Civ. A. No. 13–95 (WCC).

United States District, Court, S.D. New York.

Sept. 2, 1994.

Paul, Weiss, Rifkind, Wharton & Garrison, for American Soc. of Composers, Authors and Publishers; Jay Topkis, Allan Blumstein, Andrew J. Peck, Robert N. Kravitz, I. Fred Koenigsberg, White & Case, Richard H. Reimer, American Soc. of Composers, Authors and Publishers, New York City, of counsel.

Weil, Gotshal & Manges, for applicants; R. Bruce Rich, Kenneth L. Steinthal, Evie C. Goldstein, Jonathan T. Weiss, Martha Applebaum, Charles Stanford, Capital Cities/ABC Inc., Susanna M. Lowy, CBS Inc., Gayle Chatilo Sproul, National Broadcasting Co., Inc., New York City, of counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

In 1941, the Government settled its antitrust suit against the American Society of Composers, Authors, and Publishers ("ASCAP") with the entry of a consent judgment (the "Consent Decree"). *United States v. ASCAP*, 1940–43 Trade Cases (CCH) ¶ 56,-104 (S.D.N.Y.1941). Amended in 1950, *United States v. ASCAP*, 1950–51 Trade Cases (CCH) ¶ 62,595 (S.D.N.Y.1950), the Consent Decree continues to this day to regulate the manner in which ASCAP licenses the use of its members' music. Section IX of the Decree requires ASCAP and the users of its music to attempt, in the first instance, to agree upon a reasonable license fee for use of music in the ASCAP repertory. If the parties fail to reach agreement within 60 days, the prospective licensee may apply to this Court for "the determination of a reasonable license fee." ASCAP bears the burden of proof to establish the reasonableness of the fee it requests.

This matter is currently before the Court on ASCAP's objections to Magistrate Judge Dolinger's Report dated January 6, 1994, wherein the Magistrate, sitting as a special master pursuant to 28 U.S.C. § 636(b)(2) and Rule 53(e), Fed.R.Civ.P., recommended final blanket and per-program license fees for the local television stations owned and operated (the "O & Os") by Capital Cities/ABC, Inc. ("ABC"), CBS Inc. ("CBS"), and National Broadcasting Co., Inc. ("NBC") (collectively, the "networks").[1]

### PROCEDURAL HISTORY

ASCAP's objections arise in an unusual procedural context. In 1984, applicants Buf-

---

1. The blanket license fee covers the period from January 1, 1978 through December 31, 1995, and the per-program license fee covers the period from April 1, 1985 through December 31, 1995. However, ASCAP and the O & Os, by stipulation dated September 15, 1993, have settled disputes concerning license fees for the period ending December 31, 1994. Those fees, therefore, are not subject to review by this Court. The fees set for 1995, however, are reviewable.

falo Broadcasting Co., Inc., *et al.* and KWTX Broadcasting Co., Inc. (collectively, the *"Buffalo* applicants") filed separate applications in this Court pursuant to Section IX of the Consent Decree for the determination of reasonable blanket and per-program license fees for the period February 1, 1983 through December 31, 1995. By consent of the parties, these applications were referred to Magistrate Judge Dolinger to sit as a district judge pursuant to 28 U.S.C. § 636(c). The *Buffalo* applicants consisted of approximately 963 stations at the time of trial.

In 1987, the three networks, on behalf of the O & Os, filed a similar application in this Court for the determination of reasonable blanket and per-program license fees for the period January 1, 1978 through December 31, 1995. After ASCAP refused to consent to have the O & Os' application referred to Magistrate Judge Dolinger to sit as a district judge pursuant to 28 U.S.C. § 636(c), we referred the application to him to sit as a special master pursuant to 28 U.S.C. § 636(b)(2). At the time of trial, there were 20 O & Os.

On September 16, 1987, Magistrate Judge Dolinger consolidated the three matters for trial, which began on December 10, 1990 and concluded on February 19, 1991. On January 6, 1994, he both filed his Report as Special Master with this Court for the O & O applicants and entered judgment adjudicating final blanket and per-program license fees for the *Buffalo* applicants. Thereafter, ASCAP appealed directly to the Second Circuit as to the *Buffalo* applicants and filed objections to the Special Master's Report with this Court as to the O & Os. However, ASCAP's attacks on Magistrate Judge Dolinger's rulings and findings are essentially identical for all applicants; they emanate from the same 226–page Opinion and Order he issued on February 26, 1993 after the lengthy trial (the "Report").[2] Therefore, in essence, this Court and the Second Circuit

will be simultaneously reviewing the same claimed errors in the same decision. Our decision as to the O & Os is, of course, ultimately reviewable by the Second Circuit.[3]

## BACKGROUND

### A. ASCAP and the Consent Decree

ASCAP is an unincorporated membership association consisting of over 50,000 music composers, lyric writers, and publishers to which its members have assigned the non-exclusive right to license the non-dramatic performing rights to their copyrighted compositions. ASCAP's repertory contains over three million compositions, and it licenses the right to perform those compositions to a variety of music users such as television and radio networks and stations, cable television services, nightclubs, restaurants, and bars. *United States v. ASCAP/Applications of Capital Cities/ABC, Inc. and CBS Inc.*, 831 F.Supp. 137, 141 (S.D.N.Y.1993) (hereinafter, *"ABC/CBS "*).

The Consent Decree was "designed to limit ASCAP's ability to exert undue control of the market for music licensing rights through its control of a major portion of the music available for performance and its use of the blanket license as a means to extract non-competitive prices." Report of the Special Master, at 11 (hereinafter "Rep.") (citing *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 570 (2d Cir.1990)) (hereinafter, *"Showtime "*) (other citations omitted). The Decree permits ASCAP to obtain from its members only the non-exclusive right to license the members' compositions; the members retain the prerogative to license such rights themselves or to assign the rights to an agency other than ASCAP. Furthermore, pursuant to Sections VI and VII(B), respectively, ASCAP must make available to the users at issue in this case both a blanket

---

2. Magistrate Judge Dolinger issued subsequent rulings on May 27, 1993, June 30, 1993, and October 28, 1993 clarifying certain aspects of the February 26 Report. He also approved stipulations entered by the parties on September 15, 1993 and January 6, 1994.

3. We denied the O & Os' motion to stay our decision pending the decision by the Second Circuit as to the *Buffalo* applicants. On July 11, 1994, the Second Circuit granted ASCAP's motion to defer argument on its appeal from the Magistrate Judge's decision as to the *Buffalo* applicants.

license and a per-program license.[4] The blanket license is the most widely used form of license by ASCAP licensees. In exchange for the right to make unlimited use of all such music, the blanket licensee pays a specified sum to ASCAP each year. The per-program license, on the other hand, has been less widely used, and "amounts to a mini-blanket license in that it permits the licensee to use as much ASCAP music as it wishes ... [while] ... pay[ing] fees only for those programs that actually use such ASCAP music." Rep. at 12. Importantly, the Decree, Section VIII, requires ASCAP to "use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses."

In addition to, or in place of, licenses from ASCAP and Broadcast Music, Inc. ("BMI"), ASCAP's rival licensing society, music users can get source and direct licensing. A source license is one whereby the producer of the program procures from the copyright owner the performance rights to the music used in the program, and then conveys those rights to the local television station. A direct license is one whereby the station itself obtains directly from the copyright owner the performance rights to the music used in the program it broadcasts. *ABC/CBS*, 831 F.Supp. at 142.

## B. The Applicants

The *Buffalo* and O & O applicants are local television stations who broadcast programming each day in limited geographic areas. These stations can be grouped into 3 categories: (1) network affiliated stations, i.e., stations who obtain a portion of their programming each day from one of the networks, with the balance of the programming day devoted to locally produced or syndicated programming;[5] (2) independent stations, i.e., stations who do not use network-supplied programs but rather fill up the programming day solely with locally-produced or syndicated programming; and (3) O & Os, i.e., local stations who operate in the same manner as the network-affiliated stations but who are owned and operated by the networks themselves.

## C. Prior Licenses

ASCAP and the local television station industry have an extensive history of prior dealings that is relevant to the current fee dispute. Magistrate Judge Dolinger compre-

---

4. Section VI reads as follows:

Defendant ASCAP is hereby ordered and directed to grant to any user making written application therefor a non-exclusive license to perform all of the compositions in the ASCAP repertory. Defendant ASCAP shall not grant to any user a license to perform one or more specified compositions in the ASCAP repertory, unless both the user and member or members in interest shall have requested ASCAP in writing so to do, or unless ASCAP, at the written request of the prospective user shall have sent a written notice of the prospective user's request for a license to each such member at his last known address, and such member shall have failed to reply within thirty (30) days thereafter.

Section VII(B) reads as follows:

Defendant ASCAP, in licensing rights for public performance for radio broadcasting and telecasting, is hereby ... ordered and directed to issue to any unlicensed radio or television broadcaster, upon written request, per program licenses, the fee for which (1) in the case of commercial programs, is, at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory

shall be performed, or (b) based upon the payment of a percentage of the sum paid by the sponsor of such program for the use of the broadcasting or telecasting facilities of such radio or television broadcaster, (2) in the case of sustaining programs, is at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the card rate which would have been applicable for the use of its broadcasting facilities in connection with such program if it had been commercial, and (3) subject to the other provision of Section VII, takes into consideration the economic requirements and situation of those stations having relatively few commercial announcements and a relatively greater percentage of sustaining programs, with the objective that such stations shall have a genuine economic choice between per program and blanket licenses.

5. Locally produced programming is that which is produced by or for the local station itself. Syndicated programming is that which is obtained by sale or license from producers or distributors.

hensively sets forth the pertinent details of the these dealings in his 226–page opinion, see Rep. at 22–32, 124–127, familiarity with which is presumed. We set forth here only a brief summary of (1) the independent and network-affiliated stations' negotiating, litigating, and licensing history with ASCAP, and (2) the O & Os' similar history with ASCAP.

### 1. The Independent and Affiliated Stations

In 1949, ASCAP and the local stations reached an agreement for a blanket license, modelled on an already-existing radio license, that called for a percentage-of-revenue fee formula—i.e., a license fee based upon a set percentage of the stations' gross revenues. The percentage agreed upon was 12.25%. The local stations were also interested in per-program licenses but were unable to reach agreement with ASCAP. Therefore, the stations instituted a rate proceeding in this Court in July 1951 known as *United States v. ASCAP/Application of Voice of Alabama, Inc.*, Civ. No. 13–95 (S.D.N.Y.1951). Before any opinion issued, ASCAP moved to amend the Consent Decree to eliminate its obligation to offer a per-program license to any broadcaster that held a license from BMI. However, ASCAP withdrew its motion after the parties came to an agreement on a new set of licenses. These licenses (the *"Voice of Alabama* licenses") began in 1954, terminated in 1961, and called for a blanket license fee of 2.05% of station revenues and a per-program license fee of 9% of the net revenues of programs using ASCAP music.

By late 1960, local television station revenues were rising, and the local stations tried to reduce the fees they were paying to AS-CAP. They went to the rate court once again, in a proceeding known as *United States v. ASCAP/Application of Shenandoah Valley Broadcasting, Inc.*, Civ. 13–95 (S.D.N.Y.1961), to compel ASCAP to offer a license which would exclude from its coverage pre-recorded syndicated programming. This Court denied the stations' request, and the stations thereafter filed a second application in the rate court for the determination of reasonable blanket and per-program license fees. Prior to adjudication, however, in 1969 the parties reached agreement on a new set of blanket and per-program licenses (the "*Shenandoah* license"). The blanket license fees were computed by a stairstep formula providing (1) a base fee of 2% of the stations' average net revenue for 1964 and 1965, and (2) an incremental fee of 1% of future revenue in excess of the base revenue. As compared with the *Voice of Alabama* license, this license was estimated to save the stations about $53 million over its ten-year life. The per-program license fees were the same as in the *Voice of Alabama* license, i.e., 9% of the net revenues of each program containing uncleared ASCAP music. The *Shenandoah* license was to run from 1968 through 1972, and would be automatically renewed for an additional 5 years thereafter unless either side gave notice of cancellation within the time specified. In fact, the license did run for the full 10–year period.

Following the termination of the ten-year term of the *Shenandoah* license in 1977, the local television stations again sought to decrease the fees they were to pay to ASCAP.[6] The parties agreed to extend the *Shenandoah* license through mid–1978, after which time they filed an antitrust challenge to AS-CAP's use of the blanket license. Although the district court found the blanket license to constitute an unreasonable restraint of trade, the Second Circuit reversed. *Buffalo Broadcasting Co. v. ASCAP*, 546 F.Supp. 274 (S.D.N.Y.1982), *rev'd*, 744 F.2d 917 (2d Cir. 1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). During the pendency of this suit, the parties agreed to various extensions of the *Shenandoah* license whereby its terms remained in effect through

---

**6.** Magistrate Judge Dolinger noted that several factors affected the stations' determination that the fees they were paying under the *Shenandoah* license were inappropriate. First, although later reversed by the Supreme Court, *BMI v. CBS Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Second Circuit in 1977 held that ASCAP's blanket license was an unlawful price-fixing mechanism in violation of Section 1 of the Sherman Act. *CBS Inc. v. ASCAP*, 562 F.2d 130 (2d Cir.1977). Second, beginning in the mid–1970's, the stations' revenues grew at an unprecedented rate and exceeded the stations' projections from 1969 on which the negotiators involved in the *Shenandoah* agreement had relied in accepting a percentage-of-revenue formula.

January 31, 1983. In 1984, the *Buffalo* applicants filed the instant application.

### 2. The O & Os

The O & Os' bargaining and litigating history with ASCAP is somewhat different from that of the other local stations. In 1964 or 1965, the O & Os agreed to a stairstep formula for a blanket license with a base rate of 1.9% of 1963 revenues and an incremental fee of 1.325% of all additional revenues. Thereafter, the O & Os allowed the All-Industry Committee, the negotiating team representing the independent and affiliated local stations, to take the lead in negotiations with ASCAP. For the period ending at the close of 1977, the O & Os ultimately chose to agree to the *Shenandoah* stairstep formula applicable to the multitude of other local stations. However, the O & Os reached no agreement with ASCAP for the period after 1977. In 1987, the O & Os filed the instant application.

## D. The Parties' Positions at Trial

### 1. The Blanket License

ASCAP argued at trial that the terms of the *Shenandoah* license, with several minor modifications, should be imposed upon the O & Os for the period at issue because the O & Os' approval of this license in the past proves its continuing reasonableness. As to the proposed modifications, ASCAP contended that the base fee should be increased so as to account for unanticipated inflation from 1973 through 1978, and suggested that the definition of station revenue be expanded.

The O & Os argued that the *Shenandoah* license, or any other percentage-of-revenue formula, should not be imposed. First, they contended, a percentage-of-revenue formula gives ASCAP a share of their business revenue regardless of whether such revenue is attributable to use of ASCAP music. Second, they claimed, ASCAP's ability to extract such an agreement from the local stations in the past reflects ASCAP's control of the music rights market and is not reflective of the results that would be obtained in a freely competitive market.

The O & Os proposed two alternative fee formulas. First, they suggested that the local stations' fees should be 56% of the networks' total fees for each year at issue. They argued that the networks have greater bargaining leverage than they do relative to ASCAP so that the fees agreed to by the networks are more representative of a competitive market rate, and that the local stations use 56% as much music as do the networks. Second, they alternatively proposed that the local stations' fees should be 1.38 times the fee payable by the networks for each year at issue. They argued that the total fee payable by the local stations from 1968 to 1972 compared with the fees payable by the networks for that same period yields a ratio of 1.38 to 1, which ratio should then be applied for the subsequent years at issue.

### 2. The Per-Program License

ASCAP again looked to prior agreements and licensing history in arguing that the per-program license fee should be set at a ceiling of 4 times the rate of the blanket license fee, with an appropriate reduction for the number of programs containing no uncleared ASCAP music. That is, if all of a local station's non-network programs contain uncleared ASCAP music, the station's per-program fee would be 400% of its blanket license fee; if, one-quarter of a station's revenues from non-network programming were derived from programs containing no ASCAP music, the per-program fee would equal 300% of its blanket license fee.

ASCAP also proposed rules clarifying the circumstances in which a fee obligation is triggered. If a commercial or promotional or public service announcement containing ASCAP music is aired between segments of a non-network program or prior to the start of such program, the revenue attributable to that program and the "ads" would be subject to a fee even if the program itself contains no ASCAP music. Likewise, if the producer's logo displayed at the start or end of the program is accompanied by ASCAP music, the revenue attributable to that program would be subject to a fee. Similarly, if a local commercial containing ASCAP music is aired between segments of a network pro-

gram or prior to the start of such program, the revenues attributable to the commercial would be subject to a fee.

Lastly, ASCAP argued that users opting for a per-program license should pay an administrative fee to cover the additional costs ASCAP would incur in monitoring the stations' music use.

The O & Os, on the other hand, argued that the fee ceiling for the per-program license should be equal to the amount of the blanket license, citing the Consent Decree's mandate that ASCAP offer a per-program license on terms that afford the licensee a genuine choice between that license and a blanket license. The O & Os also disagreed with ASCAP as to what should trigger a fee obligation. They contended that a fee should be due only for programs that contain AS-CAP music themselves. If commercials and public service announcements contain AS-CAP music, an "incidental use fee" should be imposed at 7.5% of the maximum per-program license.

## THE SPECIAL MASTER'S REPORT

Magistrate Judge Dolinger began his discussion by enunciating some general standards for fee-setting. Noting that the purpose of the Consent Decree is to limit AS-CAP's ability to charge supra-competitive license fees, he recognized that in setting a "reasonable" fee, the rate court must " 'define a rate or range of rates that approximates the ·rates that would be set in a competitive market.' " Rep. at 41 (quoting Showtime, 912 F.2d at 576) (opinion of trial court) [7] (other citations omitted). He noted the difficulty, however, in so doing. Specifically, because the relevant market at issue, i.e., music use licenses comparable to those offered by ASCAP and BMI, involves only two principal licensors, the market is inherently non-competitive. Hence, there is no direct evidence of the price a truly competitive market would yield for the licenses at issue. Accordingly, Magistrate Judge Dolinger noted that in prior rate-setting proceedings, the court has "focussed principally

on agreements voluntarily arrived at by the same or comparably situated parties contracting for the same or comparable rights . . . [because] agreements reached after arms-length negotiations are at least a starting point for assessing what fees would be consistent with the policy of encouraging competitive-type pricing in this industry." Rep. at 45 (quoting Showtime, 912 F.2d at 582). He emphasized, however, that the court should not blindly apply the terms to which these or similar parties agreed in the past; rather, the court must examine the degree of comparability of the parties, the rights at issue, and the economic circumstances affecting the parties.

### A. The Blanket License

#### 1. Assessing ASCAP's Proposal

Magistrate Judge Dolinger disagreed with ASCAP and declined to rely on the Shenandoah license as a basis for determining a reasonable fee for the O & Os because he concluded that the Shenandoah agreement "cannot be seen as a reliable measure of what terms would have been produced by a competitive market, had one existed at the time." Rep. at 51.

In reaching this conclusion, Magistrate Judge Dolinger made several findings of fact. First, the O & Os did not simply acquiesce to the terms therein; rather, they attempted, albeit unsuccessfully, to get reduced fees via several routes.

Second, the fact that the stations' negotiators agreed to Shenandoah does not in itself indicate they believed the terms therein were reasonable. To the contrary, the negotiators' testimony indicated otherwise.

Third, and perhaps most importantly, the negotiators viewed their alternatives to a negotiated blanket license as severely constrained. Specifically, they believed direct licensing was not a practically or economically viable alternative because (1) the administrative expenses were daunting, (2) the likelihood of successfully licensing all music use in

---

**7.** The trial court's opinion in Showtime is published in the Federal Reporter as an appendix to the Second Circuit's opinion which upheld the trial court's fee determination. Showtime, 912 F.2d at 572–98.

this manner was minimal, and (3) there would likely be little savings realized even if the music use could be successfully licensed because ASCAP members have little incentive to accept less for direct licenses than they expect to receive from ASCAP. Similar concerns precluded source licensing from being viewed as a viable alternative to an ASCAP blanket license. Moreover, if a station were to insist on obtaining performance rights at the source, it faced the risk that the programs' producers would simply sell the programs to other buyers who did not so insist. Nor was per-program licensing viewed as a viable alternative because (1) ASCAP offered this license at substantially higher rates, and (2) ASCAP was adverse to offering such a license due to its fear that stations would obtain a BMI blanket license and an ASCAP per-program license, thereby saving money by consciously reducing the use of ASCAP music in their programming. Lastly, the O & Os did not view the alternative of invoking the assistance of the rate-court as a viable option. Specifically, in light of the fact that Judge Ryan, the rate-court judge with jurisdiction over the *Shenandoah* proceeding, suggested that he viewed ASCAP's fee proposal as reasonable and that if the local stations declined to settle they would bear the burden of proving that the *Voice of Alabama* agreement was not reasonable, the stations did not view the rate-court as a realistic alternative to the terms on the table in 1969. The O & Os reasonably believed they would fare no better through adjudication.

In sum, Magistrate Judge Dolinger concluded that the documentary and testimonial evidence introduced at trial supported the stations' belief that the alternatives to a negotiated blanket license were either illusory, more costly, or far more risky than agreeing to the percentage-of-revenue formula of the *Shenandoah* license. This perceived absence of alternatives, he concluded, supports the finding that the stations "were not able to exert bargaining leverage equivalent to that of ASCAP [so that] it is to be doubted that the *Shenandoah* formula was the equivalent of a competitive market outcome." Rep. at 77.

Fourth, in further support of his conclusion that the *Shenandoah* agreement, particularly with its percentage-of-revenue formula, was not reflective of a competitive market outcome, Magistrate Judge Dolinger discussed the disparity between the fees paid by the local stations and those paid by the networks for the same time periods. Specifically, he found that because the networks have greater bargaining leverage with ASCAP than do the local television stations, their agreements with ASCAP can be viewed as more representative of a competitive market. These agreements, beginning in 1965 for CBS and shortly thereafter for ABC and NBC, contained flat-fee rather than percentage-of-revenue fee structures. This flat fee structure proved to be more advantageous to the licensees: for the period 1968 through 1972, the stations paid ASCAP 38% more than did the networks, and by 1977, 140% more. Moreover, if the Court were to implement ASCAP's proposed revised *Shenandoah* formula, the stations would pay ASCAP 211% more than would the networks by 1989. Magistrate Judge Dolinger pointed out that such disparity is especially significant in light of the fact that at least in the late 1960's and 1970's, the networks used more ASCAP music than did the local stations.

In sum, based on the above findings, Magistrate Judge Dolinger concluded that the *Shenandoah* blanket license was not a reasonable fee structure for the period of time it covered. He then concluded that even if it was reasonable for that time period, the evidence suggests that it is not reasonable to impose the same fee structure for the subsequent period at issue.

In reaching this second conclusion, Magistrate Judge Dolinger initially noted that a percentage-of-revenue formula is inappropriate, especially as a long-term arrangement, because "the value of the rights acquired ... is not ordinarily a direct function of the station's revenue." Rep. at 83. As evidence of this, he pointed out that as the stations' revenues were rising during the period at issue, the frequency of their ASCAP music use was declining. Moreover, fees for other creative elements that contribute to the production of a program, i.e., acting, directing,

script-writing, cinematography, choreography, etc., are not based upon a percentage of the stations' revenues. Even in those instances in the entertainment industry where one is compensated based on a percentage-of-revenue formula, the compensation is measured by the revenue of the productions to which that person actually contributed. AS-CAP's blanket license proposal, on the other hand, contains a percentage-of-revenue formula based on all programming, whether or not each program uses ASCAP music.

In further support of his conclusion that the *Shenandoah* agreement with its percentage-of-revenue formula should not be relied on for the period at issue, Magistrate Judge Dolinger found especially significant the fact that following 1972, the agreement spawned license fees in excess of that which the stations had anticipated. Specifically, he noted that in agreeing to the license in 1969 and again in 1972, the local stations relied upon an expectation of 6% revenue growth. However, after 1972, inflation soared and revenue rose at a faster rate than had been anticipated, which resulted in greater license fees pursuant to the percentage-of-revenue formula than had been expected for the 1973–1977 period. Thus, he rejected ASCAP's suggestion that the *Shenandoah* license is reasonable for the period after which it expired or that the local stations "would have accepted a percentage formula at the rates set in *Shenandoah* for the period through 1977 ... or that they would have agreed ... to a perpetual percentage-of-revenue formula irrespective of future industry developments." Rep. at 88 (citing *Showtime*, 912 F.2d at 579).

As final support for his conclusion that the *Shenandoah* agreement should not be relied upon for the post-*Shenandoah* period, Magistrate Judge Dolinger again discussed the great disparity in actual license fee dollars between the local stations and the networks. Recognizing that the local stations and the networks make comparable use of ASCAP music in terms of frequency and type of use, he concluded that there is no evidence in the record to justify the fact that ASCAP's proposal would result in fees for the local stations that would increase by 469% since 1970,

as compared with fees for the networks that would increase by 175% during the same period.

### 2. Assessing the O & Os' Proposals

Having come to these conclusions, Magistrate Judge Dolinger next evaluated the stations' two alternative proposals, which are both based on prior agreements between the networks and ASCAP. He recognized in theory that the networks' licensing history with ASCAP may be an appropriate guide for setting fees for the local stations due to the fact that the music use of the two groups has been comparable over the past 20 years and that the networks' bargaining leverage vis-a-vis ASCAP is greater than that of the local stations. However, he nonetheless concluded that neither proposal was an appropriate method for fee setting under these facts.

As to the stations' first proposal that they pay 56% as much as the networks pay for each year at issue, Magistrate Judge Dolinger noted that such a structure understates the value of the license. While correctly considering extent of music use in valuing the blanket license, this structure does not adequately consider the unique benefits of the blanket license to the stations. Magistrate Judge Dolinger also noted problems with properly measuring "music use" as called for in this proposal.

As to the stations' second proposal that they pay 1.38 times as much as the networks pay for each year at issue, Magistrate Judge Dolinger discussed several problems. First, the agreements pursuant to which the networks paid fees for that period encompassed a variety of issues so that it is not reasonable to isolate one issue in each agreement and give it precise economic significance. Second, during that time period, the networks required their local affiliates to pay one half of their fee obligations. Had the networks, instead, been required to shoulder the full fee burden, they likely would have pressed for lower license fees, which would increase the 1.38 to 1 ratio for those years. Third, the networks' audience share has decreased since 1972 while that of the stations has not, and the networks' share of feature music

plays has decreased since 1972. Fifth, NBC's and ABC's fees for most of the 1980's were solely on an interim basis. Lastly, it is possible that the networks agreed to percentage-of-revenue fees for their O & Os as a *quid pro quo* for obtaining reduced network license fees so that relying on those agreements as products of a competitive market would not be appropriate.

Because the above considerations were not taken into account in the stations' proposals, Magistrate Judge Dolinger concluded that "although the network model is, in general terms, an attractive one, its uncertainties in the face of the current record suggest that it is not the most desirable approach to take with the materials we have at hand." Rep. at 106.

### 3. Magistrate Judge Dolinger's Approach

Having rejected both ASCAP's and the O & Os' proposals for reasonable blanket license fees, Magistrate Judge Dolinger turned to formulating his alternative approach. He first delineated the fee formula applicable to the *Buffalo* applicants for the period February 1, 1983 through December 31, 1995. He then concluded that the same fee formula is applicable to the entire period at issue for the O & Os, 1978 through 1995, because the two groups of stations, although having slightly different licensing histories, are similarly situated for fee-setting purposes.[8] We first set forth the fee formula Magistrate Judge Dolinger devised, and then discuss how he arrived at this conclusion.

Magistrate Judge Dolinger recommended that the blanket license fee for the O & Os for the period January 1, 1978 through January 31, 1983 be calculated as follows: the base fee is the total amount due from the O & Os pursuant to the *Shenandoah* agreement for calendar year 1972, adjusted annually by (1) annual changes in the Consumer Price Index, and (2) one-half the annual percentage change in the number of O & O stations licensed by ASCAP for each year at issue. As to the fee for the period February 1, 1983 through 1995, the same period at issue for the other local stations, he recommended for all local stations a base fee of

$19.3 million, i.e., the total fees due under *Shenandoah* from the local stations for 1972, adjusted annually by the same two factors above.

In arriving at this formula, Magistrate Judge Dolinger first noted that "a 'reasonableness inquiry does not lend itself to the application of a clear and simple formulation and ultimately involves some conceded arbitrariness on the part of the rate setter.'" Rep. at 107 (quoting *Showtime*, 912 F.2d at 593). While recognizing that he had rejected reliance on the *Shenandoah* agreement for this fee setting proceeding, he nonetheless stated that the agreement is not without significance and chose the actual dollar amount paid in 1972 under *Shenandoah* as the base fee. In reaching this conclusion, he made the following observations.

One goal the local stations had during the *Shenandoah* negotiations was to reduce the actual dollar amount owing to ASCAP each year as compared with the amount due under the *Voice of Alabama* agreement. While they unsuccessfully sought a flat-fee rather than a percentage-of-revenue arrangement, they nonetheless did succeed in reducing the actual dollar burden. In agreeing to *Shenandoah*, they relied on their projections of a 6% annual revenue growth which, if borne out, would result in fee savings—a result they viewed as desirable notwithstanding their inability to obtain other structural modifications to the licensing regime. The 6% projection was relatively accurate through 1972, when the stations chose to renew *Shenandoah*. From this, Magistrate Judge Dolinger concluded that the stations viewed the actual dollar amount paid pursuant to *Shenandoah* in 1972, the last year before the unexpected inflation and revenue growth kicked in, to be reasonable, and therefore chose that figure as the base fee.

Next, Magistrate Judge Dolinger addressed ASCAP's concerns that a flat fee, as opposed to a percentage-of-revenue fee, does not account for changing circumstances. He rejected ASCAP's argument that a percentage-of-revenue fee structure is necessary to account for changes in the number of licen-

---

8. In fact, the parties themselves so stipulated.

sees and changes in economic circumstances because he had already concluded that a percentage-of-revenue formula is inappropriate as a mandated arrangement. He did agree, however, that ASCAP's concerns were relevant; he concluded that they could be addressed by instituting annual adjustments to the base fee rather than by adopting a percentage-of-revenue fee structure.

Consequently, to account for changing economic conditions, particularly inflation, he deemed a cost-of-living adjustment necessary. He chose, without much discussion, to use the Consumer Price Index to account for inflation and loss of purchasing power.

To account for the change in the number of local stations operating under the license, Magistrate Judge Dolinger chose to adjust the base fee each year by one-half the percentage increase in stations under license. He chose this discounted adjustment because he felt that a *pro rata* adjustment would overstate the amount needed to account for such changes because (1) new stations tend not to be representative of the group of licensed stations in that they often have shorter broadcast days, use less ASCAP music, and have smaller audiences, (2) the 1972 base fee itself is likely on the high side of reasonableness due to the stations' lack of alternatives when they agreed to this fee, and (3) there was no reason to give ASCAP a full *pro rata* increase to cover the change in number of stations because neither the network agreements, with their flat-fee arrangements, nor the *Shenandoah* agreement, provided for such an adjustment for industry expansion.[9]

Magistrate Judge Dolinger then noted that because the only two adjustments he intended to make to that base fee were for cost-of-living changes and changes in the number of stations, use of the 1972 fee as a base is appropriate only if other conditions in the industry affecting the fee level have remained unchanged since 1972. He discussed

the two other principal factors that should be taken into account in altering a fee from a pre-set base: the nature of the rights at issue and the value of the rights at issue. He concluded from the evidence before him that (1) the nature of the rights at issue has not changed since 1972, and (2) the value of the rights at issue has not substantially changed since 1972 because music use and audience share have not significantly changed since then.[10] From this, he concluded that the 1972 fee is indeed the appropriate base fee.

Lastly, Magistrate Judge Dolinger made a "final, impressionistic check on the reasonableness of [the] blanket license formula" by comparing the outcome of the formula with fees the networks have been paying. Rep. at 117. He noted that the growth rate in per-station fees since 1972 under his formula is similar to that of the network fees, and concluded that because music use and other relevant factors are similar for the two groups, this consistency in fees is further proof of the reasonableness of the formula he devised.

### B. The Per–Program License

#### 1. Background

In discussing the per-program license, Magistrate Judge Dolinger first noted the advantages the per-program license affords over the blanket license. In sum, if priced in a certain way, and if the user either has little music in its programs or licenses much of its music directly from the copyright holder or at the source from the producer, the broadcaster can forego the blanket license and save money by opting for the less expensive per-program license. Thus, the per-program license "serves as a counterbalance to ASCAP's market power, which is most clearly exercised by its preference for the blanket license." Rep. at 130–31 (quoting *United States v. ASCAP*, 782 F.Supp. 778, 810 (S.D.N.Y.1991)).

---

9. Magistrate Judge Dolinger noted that while the *Shenandoah* agreements' percentage-of-revenue formula did automatically adjust for new licensees, it did not do so on a *pro-rata* basis because the stairstep formula led to a gradually decreasing percentage-of-revenue fee.

10. Magistrate Judge Dolinger noted that the intensity of music use by the stations, as measured by needledrops per hour, has declined since 1968, but that this trend is counterbalanced by the increase in the typical broadcast day since 1968.

Magistrate Judge Dolinger then pointed out that this potential role of the per-program license explains why the Government has endeavored to ensure its availability as a licensing alternative. Specifically, as a result of radio broadcasters complaining that AS-CAP was attempting to force them to take blanket licenses, the 1950 Consent Decree contains several provisions designed to ensure the availability of the per-program license. First, ASCAP must offer any broadcaster a per-program license upon request and cannot force a prospective licensee to negotiate for a blanket license before negotiating for a per-program license. Sections VII(B) and (C). Second, in the case of commercial programs, ASCAP may not issue a license which is based on a percentage of the revenue generated by the licensee from programs with no ASCAP music, unless the licensee so desires. Section VII(A)(1). Third, and perhaps most importantly, AS-CAP must ensure that the per-program license is a viable alternative to the blanket license:

> ASCAP [must] use its best efforts to avoid any discrimination among the fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses.

Section VIII. Thus, in sum, "the mandatory per-program option remains an integral part of the injunctive relief provided for by the Decree, necessary to provide users with a viable alternative to the blanket license." Rep. at 135 (quoting *United States v. AS-CAP*, 586 F.Supp. 727, 729 (S.D.N.Y.1984)).

Lastly, Magistrate Judge Dolinger noted one other feature of the per-program license. Pursuant to Section VII(B) of the Consent Decree, ASCAP has the right to choose between two pricing formats for commercial programming—either a specified flat fee for each covered program, or a percentage of the sponsor payments for the program under license.[11]

*2. Assessing ASCAP's Proposal*

Magistrate Judge Dolinger disagreed with ASCAP and declined to set the per-program fee ceiling at four times the stations' blanket fee rate. In so concluding, he first found that "ASCAP's per-program proposal is designed to further its aim of keeping the per-program license technically available, but practically illusory for virtually all stations." Rep. at 148. He made several findings of fact to support this conclusion.

First, he found that ASCAP has historically been averse to offering the per-program license due to its fear that licensees would use it as a mechanism to minimize use of ASCAP music; i.e., broadcasters would take a blanket license from BMI and a per-program license from ASCAP, and then decrease their ASCAP license fee payments by eliminating as much ASCAP music as possible from their programs or by obtaining more source or direct licenses.

Second, he found that ASCAP desires the per-program license to be unattractive or impractical because it provides both competition to the blanket license and a bridge to source and direct licensing.

Third, he found that ASCAP has long resisted the requirement of its availability. The 1950 Amendments to the Consent Decree were driven in part by complaints by radio broadcasters that ASCAP prevented them from obtaining reasonable per-program licenses. The *Voice of Alabama* proceeding was initiated after the local stations unsuccessfully sought to negotiate a reasonable per-program rate. Moreover, ASCAP moved the rate-court to eliminate its obligation to offer a per-program license to broadcasters who also held a blanket license from BMI, and withdrew the motion only after being assured by the Justice Department and the local stations that very few licensees were interested in the per-program alternative.

Fourth, he found that under ASCAP's proposal, if a station wished to break even on the per-program license, i.e., pay the same amount in per-program fees as it pays in

---

11. ASCAP has a similar choice with respect to sustaining programs—either a specified flat fee for each covered program, or a percentage of the

"rate-card" that would have applied had the program been a commercial one.

blanket fees, it would have to clear unlicensed ASCAP music from three-quarters of its programming in terms of revenue,[12] and from all or virtually all of the ads it runs daily,[13] a task that is prohibitively expensive and likely unfeasible.[14]

On the basis of these findings, Magistrate Judge Dolinger concluded that ASCAP's proposal is aimed at making the per-program license unavailable to all but a few broadcast licensees. He then stated that the "question is whether this is consistent with the per-program provisions of the Decree, and, if so, whether ASCAP's proposal is 'reasonable' within the meaning of Article IX(A) of the Decree." Rep. at 148.

In answering the first question, Magistrate Judge Dolinger noted that the pricing relationship between the blanket license and the per-program license will define what proportion of stations will choose the per-program license as an economically feasible alternative. He pointed out, though, that due to the generality of the Decree language, the drafters did not have in mind a precise meaning of "genuine choice." Therefore, this language does not define where, along the continuum between the 1 to 1 relationship proposed by the stations and the 4 to 1 relationship proposed by ASCAP, the per-program fee should be set. He concluded, however, that contrary to ASCAP's assertion, "it is doubtful that the 'genuine choice' requirement is satisfied by a [ ] rate structure that makes the per-program license economically feasible for only a handful of stations, if any ... [because] such an approach would trivialize what was plainly not intended to be a trivial set of provisions." Rep. at 155. He dis-

cussed several facts supporting this conclusion.

First, he rejected ASCAP's reading of Mr. Timberg's testimony in the *Buffalo Broadcasting* antitrust litigation that the per-program license and the "genuine choice" provision were intended to benefit only a few stations that use little ASCAP music. Rather, Magistrate Judge Dolinger found that Mr. Timberg merely stated his recollection that at the time of the 1950 amendments, the license was assumed to be of interest only to stations that used less music than most broadcasters.

Second, the Department of Justice, in opposing ASCAP's motion in 1984 to amend the Consent Decree to eliminate its obligation to offer per-program licenses to users who hold BMI blanket licenses, stated that the Consent Decree is clear in its mandate that a per-program license be offered to all broadcasters, and disputed ASCAP's contention that the license was never intended to apply to bulk users of music.

Third, by virtue of the fact that the per-program provisions were strengthened in the 1950 amendments to the Consent Decree, it is unlikely that the drafters intended the provisions to be available to only a few stations. Moreover, in their submissions to this Court for approval of the 1950 amendments, neither the Justice Department nor ASCAP suggested that the per-program option was to be so limited.

After concluding that the "genuine choice" language of the Consent Decree is not satisfied by a per-program fee structure that

---

12. That is, a station would have to eliminate otherwise unlicensed ASCAP music from programming that represents seventy-five percent of its revenues from syndicated and locally-produced programs, a result that could be achieved by substantial source and direct licensing or the elimination of most programs with even one needledrop of ASCAP music.

13. This is so because ASCAP also proposed that all commercial, public service, and promotional announcements, and logos, whether within or between programs, trigger a fee if they contain ASCAP music. Moreover, if these announcements precede or come between segments of a non-network program, the revenues from the

program itself trigger a fee even if the program contains no ASCAP music.

14. The expense of the per-program license vis-a-vis the blanket license is compounded by the fact that ASCAP proposed that each station not only pay its own administrative expenses incurred in tracking and reporting the music used on programs, but also reimburse ASCAP for the expenses it incurs in administering the per-program license. This would "ensur[e] that even clearance of programs representing 75 percent of the non-network program revenues earned by the station would leave the per-program license as a more costly alternative then [sic] the blanket license." Rep. at 145.

makes the license available to only a few stations, Magistrate Judge Dolinger then concluded that even if such a structure were consistent with the Decree requirements, ASCAP's proposal was nonetheless unreasonable.

In support of this finding, Magistrate Judge Dolinger first concluded that ASCAP's reliance on past agreements between it and the radio and television industries as benchmarks of reasonable per-program fees was misplaced for several reasons.

First, he found that ASCAP's analogy between its proposal and those agreements was erroneous. Specifically, the prior agreements set separate percentage rates for the two licenses, reflecting ratios of between 2.5:1 and 7:1. However, these ratios do not necessarily reflect similar differences in the actual fee levels paid by licensees because the percentages for the two licenses were applied to different bases.[15] Therefore, he concluded that it was likely that those ratios were overstated in terms of the actual fees paid. In contrast to these prior agreements, ASCAP's current proposal included a broader per-program fee base.[16] Moreover, AS-CAP concedes that its proposal would yield actual fees up to 400 percent of the blanket license. As noted above, the prior agreements likely would not have yielded such a ratio between actual blanket and per-program fees. Accordingly, Magistrate Judge Dolinger concluded that reliance on them as proof of the reasonableness of the 4:1 ratio is misplaced.

Second, he rejected ASCAP's argument that because the prior agreements had per-program rates that made the license impractical for most broadcasters, the Consent Decree permits such a structure. He noted that the Consent Decree, while defining rights for licensees, does not force the licensees to invoke those rights when reaching a negotiated agreement. Therefore, the stations' past agreements should not automatically be read to have invoked or protected those rights, and based on the evidence presented, do not "signal[ ] the industry's concession that the per-program provisions were intended to benefit virtually no player in the industry." Rep. at 159.

Third, he found that the prior agreements are not benchmarks of reasonable royalties because (1) the radio agreement negotiators likely accepted higher per-program fees because they were not interested in utilizing this form of license; (2) the negotiators of the Shenandoah agreement viewed the per-program license as a bargaining chip to be used in exchange for a less expensive blanket license; and (3) the Shenandoah agreement encompassed many issues, and trade-offs between the issues, so that it is not a reliable indicator of a reasonable rate for the per-program license, especially in light of the fact that it appears that the negotiators used the per-program license as a bargaining tool.

Last, in further support of his rejection of ASCAP's proposal, Magistrate Judge Dolinger found that ASCAP simply had not sustained its burden of proving that the fee it proposed bore a reasonable relationship to the value of the rights at issue. In so concluding, he rejected ASCAP's argument, made through its expert Professor Rosen, that because the blanket license is more efficient and hence, socially desirable, and because ASCAP's proposal will discourage use of the inefficient per-program license, AS-CAP's proposal is reasonable. Specifically, Magistrate Judge Dolinger noted that the Consent Decree seeks to ensure the availability of the per-program license alternative, and that ASCAP's proposal will subvert this stated policy. Moreover, he pointed out that although he did view the efficiency concerns as relevant, he did not agree with ASCAP

---

15. That is, the per-program fee was determined by a percentage of the revenues earned on syndicated and locally-produced programming containing uncleared ASCAP music, which did not include revenue received from ads run on network programs. The blanket fee, on the other hand, was determined by a percentage of all station revenue, including revenue received from such ads. The per-program base, therefore, was smaller than the blanket license base, so that the ratio of percentages probably overstated the difference in total fees that were generated therefrom.

16. Specifically, ASCAP's proposal included in the per-program base, revenue from ads preceding local programs and revenue from ads preceding or within network programs.

that their proposed ratio, designed to "ensure that the per-program license remains a museum artifact rather than a practical alternative in appropriate situations," Rep. at 163, was necessary to address such considerations. Rather, he concluded from the evidence in the record that a different relationship between the fees of the two licenses can serve the two goals of protecting the pro-competitive policies of the Decree and ensuring efficient utilization of scarce resources.

In sum, Magistrate Judge Dolinger concluded that ASCAP failed to meet its burden of proving that its proposal was both consistent with the "genuine choice" provision of Section VII, and "reasonable" within the meaning of Section IX(A).

### 3. Assessing the O & Os' Proposal

Magistrate Judge Dolinger, without much analysis, rejected the O & Os' proposal that the ceiling for the per-program license fee should be equal to the blanket license fee. He merely stated "that the 1:1 ratio proposed by the applicants is not the most desirable when all factors are considered," and that "a broad range of different rates would satisfy" the Consent Decree requirement of a "genuine choice." Rep. at 171. He did, however, reject ASCAP's arguments in support of the contention that the O & Os' proposal was unreasonable. Specifically, he concluded that such a ratio was not unprecedented in the negotiating history of the radio and television industries, and that even if most of the stations opted for the per-program license, a result he believed would not occur, such a scenario would not necessarily prove the unreasonableness of the proposal.

### 4. Magistrate Judge Dolinger's Approach

#### a. The Basic Fee

After rejecting both ASCAP's and the O & Os' proposals for reasonable per-program license fees, Magistrate Judge Dolinger turned to devising his own fee formula. He concluded that the "genuine choice" language of the Consent Decree means that the per-

program "price should be set in such a way that, when compared to the blanket license fee, its use is economically feasible for a significant segment of the industry either under their current programming practices or under programming policies that it would be feasible for the stations to adopt." Rep. at 172. He noted that to serve the "Decree goal of price stabilization in the face of AS-CAP's recognized market power," Rep. at 172–73, a significant number of stations should have available to them the prospect that the per-program license would either compete with the blanket license or serve as a bridge to direct or source licensing. Magistrate Judge Dolinger also pointed out, however, that countervailing considerations, such as the assurance of a fair return to both ASCAP and its composers, and the avoidance of market inefficiencies and music use disincentives, should be considered as well. Stating that no evidence was available from which to devise a precise formula to account for these considerations, he nevertheless concluded that a "per-program fee capped at an amount that bears some proximity to the blanket fee will encourage a degree of competitive pricing and yet will probably not result in such large numbers of stations opting for the per-program license as to unreasonably burden the market with undesirable additional expenses and administrative complications." Rep. at 174.

Magistrate Judge Dolinger therefore went on to devise a fee formula that, at the outset, would enable a *typical* station to operate pursuant to a per-program license at a cost roughly equivalent to that of a blanket license, not including both the administrative expenses the station would bear in tracking and reporting its own music use and the incremental fee necessary to reimburse AS-CAP for its administrative costs. Specifically, Magistrate Judge Dolinger found from the evidence presented that it was reasonable to infer that a typical station uses AS-CAP music in approximately 75% of its non-network programming,[17] therefore needing a

---

17. Although conceding this number is not scientifically precise, Magistrate Judge Dolinger arrived at it by noting that according to a study conducted by the stations, ASCAP music is used in 81–84% of syndicated programs and feature films aired on local stations. He inferred from the record evidence that ASCAP music is used less frequently in locally-produced programming.

license to cover about 75% of such programming. To have the basic fee for the per-program license equal the blanket license fee for the typical station, he found that the per-program fee ceiling would have to be set at 133% of the station's blanket fee, exclusive of the administrative costs associated therewith.[18] He concluded that this ratio is consistent with the "genuine choice" provisions of the Consent Decree because the typical station will be able to choose between a blanket and per-program license, the basic fees for which, exclusive of other costs, are equal.

However, he noted that due to the added administrative expenses, the typical station will find the per-program license more expensive than the blanket license, which will force the typical station to clear unlicensed ASCAP music from some of its programming if it desires a less expensive per-program license alternative.[19] Finally, he concluded that this pricing structure bears a reasonable relation to the value of the rights conferred: both licenses provide equally an aggregative function; the blanket license confers the benefit of being more efficient; and the per-program license confers the benefit of the opportunity to reduce license fees by pursuing alternative licensing coverage. Thus, Magistrate Judge Dolinger determined that the per-program fee ceiling for the O & Os should be set at 133% of the station's blanket fee. He also noted that because ASCAP elected, under Section VII(B) of the Consent Decree, to demand that the per-program fee be based upon a percentage of covered program revenue, it was necessary to convert the dollar amount of the actual fee, once determined, into a percentage-of-program-revenue figure. *See* Rep. at 178 note 113, 189.

### b. The Incremental Fee

Magistrate Judge Dolinger then determined that an incremental fee should be imposed so as to reimburse ASCAP for its expenses incurred in administering the per-program license. He reasoned this was necessary because the inefficiencies associated with monitoring the stations' music use should be reflected in the price of the license, just as a competitive market price would reflect the cost of production.

In setting the incremental fee, Magistrate Judge Dolinger rejected ASCAP's argument that the court, rather than adjusting the fee to account for anticipated expenses, should simply delineate the expense categories that are to be reimbursed. First, this would force the stations to choose between the two licenses without knowing the actual fee burden under the per-program license. Second, it would likely require the court to get involved in additional fee proceedings. Third, it erroneously assumes the court will grant dollar-for-dollar reimbursement and segregate the relevant expenses. Therefore, he chose to adjust the per-program fee upward to account for the reasonable expenses ASCAP would likely incur, based on the current record. Noting the difficulty in so projecting, Magistrate Judge Dolinger nonetheless concluded that because the Consent Decree does not require a dollar-for-dollar reimbursement, and because the benefits of fixing the increment now are substantial, he would set the increment at 7% of the station's blanket license fee. He arrived at this number after reviewing the evidence in the record and finding that (1) the claimed expenses for the latter part of the administration of the interim per-program license equal about 4.7% of the interim blanket fee for the same period, and 2) that figure should be increased by about one-half to account for the fact that administration of the final per-program license is likely to be more expensive than that for the interim per-program license because a greater number of stations are likely to opt for the per-program license and because locally-produced programs will now be included in the license, increasing the scope of music use reporting.

From these facts, he arrived at his 75% figure, which he concluded was a reasonable assumption given the limited data in the record.

**18.** For example, if the blanket license fee is $1,000, multiplying that fee by 133% and then again by 75% would yield a per-program fee of approximately $1,000.

**19.** *See infra* note 20.

In sum, Magistrate Judge Dolinger concluded that the basic per-program fee ceiling of 133% would be increased by an incremental fee for administrative expenses of 7% of the station's blanket license fee, a figure that would have to be translated into a percentage-of-revenue formula because ASCAP exercised its right under the Consent Decree to employ such a formula.

### c. The Incidental use Fee

Magistrate Judge Dolinger next turned to the troublesome question of how to handle music use in commercials ("ads"), public service announcements ("PSAs"), promotional announcements ("promos"), and producer's logos ("logos"). He noted the parties' disagreement on this point. ASCAP proposed that if an ad, PSA, promo, or logo with ASCAP music is aired before or during a locally-produced or syndicated program, the station should pay a fee on the revenue from those spots and the program itself, even if the program contains no ASCAP music. If a set of ads is aired before or during a network program, and if at least one of the ads contains ASCAP music, the station should pay a fee on the revenue from the entire set of ads. The O & Os, on the other hand, argue that an incidental use fee should be imposed to cover music use in ads, promos, PSAs, logos and ambient or background music incidentally picked up during news and sports coverage. That is, each station would pay, in addition to its per-program license fee, a percentage of the otherwise applicable per-program fee ceiling as compensation for these music uses, without having to monitor and report such use. The O & Os proposed a fee of 7.5%, of which 7.2% is derived from the fact that ASCAP distributes 7.2 percent of its revenues on account of musical performances in ads, promos, and PSAs, and .3% represents an increase to account for logos and ambient music use.

Magistrate Judge Dolinger rejected ASCAP's proposal for several reasons. First, with respect to ads that occur prior to the commencement of a program, he concluded that they were not a part of the program and therefore should not be treated as the equivalent of music use in the program itself.

Second, with respect to ads aired during a program, Magistrate Judge Dolinger concluded that ASCAP's position that they, too, should be treated as part of the program was inconsistent with prior positions taken by ASCAP. Moreover, with respect to both of the scenarios above, Magistrate Judge Dolinger noted that ASCAP's proposal would require each station to determine music use in all ads, a task that is expensive at best and perhaps impossible at worst due to the fact that advertising agencies do not typically provide such information to the station. In view of the fact that the aim is to minimize inefficiency, keep costs low, and ensure that the per-program license remain a viable alternative for the local stations, Magistrate Judge Dolinger concluded that it would not be reasonable to require the stations to identify this type of music to see if the ad and/or the program to which it is connected triggers a fee.

Therefore, he concluded that an incidental use formula best addresses the above problem. He noted that the stations would agree to the presumption that all ads contain ASCAP music, thereby obviating the need to identify and report music use for this category. With respect to promos and PSAs, Magistrate Judge Dolinger concluded that they too should be included within this separate fee structure because they are functionally equivalent to ads.

With respect to logos, he concluded that although they are conceptually part of the program, and therefore distinguishable from ads, promos, and PSAs, they nonetheless should also be included in the incidental use category because they represent marginal uses of music and there is contractual precedent to treat such minor uses separately.

With respect to background music picked up at news or sports events, Magistrate Judge Dolinger again noted that these uses could be considered part of the program, but that they should neither trigger a fee based on the program's revenue nor be included within the incidental use category. Specifically, he pointed out that such music uses could be subject to the "fair use" defense to a copyright infringement suit, exempt from copyright liability. Consequently, he did not

believe all such uses should be encompassed within the incidental use category. He felt it better to allow the parties to decide among themselves, or litigate in court, which of such uses would be subject to a fee under the basic per-program structure. *See* Rep. at 195–197; Memorandum and Order, dated May 27, 1993 at 19–20.

Magistrate Judge Dolinger then addressed, and rejected, ASCAP's argument that an incidental use fee is not authorized by the Consent Decree and amounts to a hybrid license of the type previously held to be improper in *United States v. ASCAP/Application of Shenandoah Valley Broadcasting, Inc.*, 208 F.Supp. 896 (S.D.N.Y.1962), and *United States v. ASCAP/Application of National Broadcasting Co.*, 1971 Trade Cas. (CCH) ¶ 73,491, 1970 WL 556 (S.D.N.Y.1970). He stated that in *Shenandoah*, the stations sought a blanket license with a carve-out provision for certain programming and a mandatory source-licensing requirement. Because the court found that this was neither a blanket license nor a per-program license, it held that it could not compel ASCAP to offer it. Magistrate Judge Dolinger noted that in *NBC*, again the court did not compel ASCAP to offer the license the network requested because it, being limited to certain ASCAP compositions, was neither a blanket license nor a per-program license. Magistrate Judge Dolinger contrasted those two cases with the one at bar and concluded they were distinguishable because the incidental use fee he devised "is, in effect, a per-program license which simply sets different rates for different types of programs." Rep. at 198.

Having rejected ASCAP's arguments in opposition, and having stated that he would devise an incidental use fee, Magistrate

Judge Dolinger then used the stations' figures and set that fee at 7.5% of the per-program fee ceiling of 133%, which equals approximately 10% of the blanket license fee. *See* Memorandum and Order dated June 30, 1993.

In sum, Magistrate Judge Dolinger concluded that an incidental use fee of 10% of the blanket license fee, and an increment for administrative expense of 7% of the blanket license fee, should be added to the basic per-program fee ceiling of 133%. Thus, he set the total per-program fee ceiling at 150% of the blanket license fee.[20]

#### d. Unknown Music

Magistrate Judge Dolinger next devised some rules for allocating the burden of unidentified music. He noted that although the parties may try, it is not always possible to identify all the compositions in all of the non-network programming aired by the local stations, a task that is required in order to determine whether those programs trigger a per-program fee.

With respect to locally-produced programs, he concluded any such program with unidentified music will be presumed to contain ASCAP music and thus generate a fee. With respect to syndicated programs, he concluded that if the music used on such a program cannot be identified, the station should pay 50% of the otherwise applicable fee, a structure that reflects the fact that both parties have potential access to music-use data and provides sufficient incentive for both sides to endeavor to identify such music.

#### e. Split Works

Magistrate Judge Dolinger next addressed the issue of the treatment of compositions in

---

**20.** To calculate the per-program fee due from a station, the station first must calculate its per-program fee ceiling (i.e., the amount of its per-program fee if all of its non-network programs contain ASCAP music) by multiplying its otherwise applicable blanket license fee by 140%. The station then determines the percentage of its revenues attributable to programs containing ASCAP music, and multiplies the above fee ceiling by this number. The station then adds to the resulting figure an additional 10% of its blanket license fee as the incidental use fee. An example may be helpful. If a station's monthly blanket license fee is $1,000, then its maximum per-

program fee is $1,400 ($1,000 × 140%). If 50% of the station's revenues are derived from programs with uncleared ASCAP music, its basic per-program fee would be $700 ($1,400 × 50%). Adding in the station's incidental use fee of $100 (10% of the $1,000 blanket license fee), the final per-program fee would be $800.

The effect of Magistrate Judge Dolinger's fee formula is to enable a station to break even on the per-program license, that is, pay the same in blanket and per-program fees, if 64.3% of the station's revenues are attributable to programs containing uncleared ASCAP music.

non-network programming that appear in the repertory of more than one performing rights society. This can occur when a work was the joint product of two composers, each of whom belongs to different societies. He noted that under copyright law, if a broadcaster obtains a license for the performance of the work from one of two or more joint copyright holders, he is immune from copyright liability to the other copyright holder(s). He concluded from this that because there is no legal basis in this circumstance to hold a broadcaster who holds a license from BMI for the use of a given work also liable for fees to the ASCAP copyright owner, there is no need to impose a per-program fee for such use.

## DISCUSSION

■ Pursuant to Rule 53(e)(2), we are to accept the findings of fact of a special master appointed pursuant to 28 U.S.C. 636(b)(2) unless they are clearly erroneous and we are to review conclusions of law *de novo*. Although it is often difficult to determine whether the nature of a finding is factual or legal, the Second Circuit has given us some guidance on this issue in *Showtime*, the first and thus far only appeal to challenge a final license fee determination by the rate-court. In that opinion, Judge Newman wrote:

> Fair market value is a factual matter ... [b]ut the factual component of the issue before the [trial court] does not render all aspects of [its] decision-making subject to review under the "clearly erroneous" standard. In making a factual determination, a decision-maker might rely on legally impermissible factors, fail to give consideration to legally relevant factors, apply incorrect legal standards, or misapply correct legal standards.

*Showtime*, 912 F.2d at 569. In other words, while the ultimate determinations as to whether a license fee is reasonable and whether ASCAP has borne its burden of proving reasonableness are questions of fact, the legal principles controlling those factual determinations must be accorded plenary review.

## A. The Blanket License

### 1. Our Decision in ABC/CBS

In its objections to Magistrate Judge Dolinger's Report, ASCAP relies heavily on our decision in *ABC/CBS*, 831 F.Supp. at 137. Therefore, we briefly discuss it here. In setting final blanket license fees for ABC from 1986 through 1993 and for CBS from 1991 through 1993, we initially noted that the Second Circuit stated in *Showtime* that in setting a license fee, the court must attempt to determine the fair market value of the rights at issue. However, we concluded that such an analysis is difficult at best in light of the fact that the market for blanket licenses is inherently and necessarily non-competitive. We therefore found it more instructive to look directly to "prices negotiated voluntarily in an arms-length transaction [as] the only palpable point from which to proceed towards an estimation of fair value for later periods." *Id.* at 145. We then noted, however, that it would be improper simply to accept the terms of those earlier agreements; rather, we would (1) examine the distinctive factors impacting those agreements, (2) consider claims that the agreements resulted from an inequity in bargaining power, and (3) account for changed circumstances by making adjustments for both changes in the economic circumstances of the industry in general and the parties in particular and changes in the nature and value of the rights at issue.

We then evaluated four agreements between ASCAP and the networks to see which, if any, represented appropriate benchmarks of reasonable fees at the time they were consummated. We declined to rely on the 1992 NBC agreement which finalized fees for the period 1976 through 1993 because we concluded that considerations peculiar to NBC affected the terms of that agreement, as particularly evidenced by its percentage-of-revenue fee formula which was a substantial departure from the prior practice of flat-fee arrangements. We also held that an approach based solely on a percentage-of-revenue formula is not a reasonable measure of the value of a music performance license, especially because it takes no account of changes in music use.

As to the three other agreements—the 1981 CBS agreement which finalized fees for the period 1970 through 1985, the 1985 CBS agreement which finalized fees for the period 1986 through 1990, and the 1985 ABC agreement which finalized fees for the period 1977 through 1985—we concluded they were reliable benchmarks of reasonable license fees for the periods of time they covered. In so concluding, we rejected several arguments advanced by the networks, including their contention "that the nature of the blanket license forecloses access to other licensing options" enabling ASCAP to extract inflated royalties. *Id.* at 154. Specifically, we found that because the networks neither vigorously pursued alternative licensing options nor offered evidence to support their contention that they did not view the rate-court as a means to limit ASCAP's bargaining leverage, they could not be heard to complain that alternatives were unavailable.

We then chose the 1985 CBS fee of $9.8 million as the appropriate base fee, a reliable benchmark of a reasonable royalty for both ABC and CBS, and next considered changed circumstances which required adjustments to the base.

We first noted that we must incorporate changes in music use when calculating music licensing fees so as to account for the varying value of music to the networks over time. We looked to "use credits" as gleaned from ASCAP data to calculate the adjustment to the base fee for changes in music use.

We then stated that we must account for changing economic circumstances. We rejected the networks' proposal that we adjust the base fee to account for inflation by looking to changes in the Consumer Price Index. Rather, we held that an adjustment for changes in the networks' gross revenue is a better method because it "provides a more accurate index of the overall changes in the economic conditions confronting the networks." *Id.* at 161. First, it provides a more industry-specific measure of inflation. And second, it accounts for "competition from alternative entertainment media, changes in the relative economic fortunes of the networks, and variations in network viewership and audience share." *Id.*

## 2. Analysis

Magistrate Judge Dolinger, appropriately, first examined the *Shenandoah* agreement to see if it could be relied upon as a benchmark of reasonable license fees for the period of time it covered. *See ABC/CBS,* 831 F.Supp. at 145 (court should look to "prices negotiated voluntarily in an arms-length transaction [as] the only palpable point from which to proceed towards an estimation of fair value for later periods"). In so doing, he made the factual finding that although the agreement was negotiated in an arms-length transaction, it nonetheless was the product of an inequality in bargaining power due to ASCAP's market power and the stations' perceived lack of alternative licensing options. He found that these factors combined to play a significant role in the stations' ultimate acceptance of the *Shenandoah* formula. These factual findings have ample support in the record and are not clearly erroneous.

First, with respect to direct and source licensing, the Magistrate was entitled to find based on the evidence presented that although the stations did not vigorously pursue direct and source licensing before agreeing to the terms of *Shenandoah,* they reasonably believed such alternatives were unavailable. For reasons discussed above and more fully explained in the Magistrate's Report and the record, neither option was believed to be practically or economically feasible as a substitute for blanket licensing from ASCAP.

Second, with respect to per-program licensing, the record evidence supports Magistrate Judge Dolinger's finding that the stations viewed this option as illusory because it was offered at a much higher price than the blanket license and because, according to the testimony of ASCAP's own witnesses, ASCAP was loath to make it more available or affordable. Moreover, the evidence suggested that the stations viewed the per-program option essentially as a tool of added leverage to obtain a reduced blanket license fee because the stations were not able through negotiation to obtain the per-program license at a rate not substantially in excess of the blanket license.

Lastly, with respect to the rate court, Magistrate Judge Dolinger was entitled to credit the record evidence in finding that the rate court was perceived to be unavailable for meaningful relief from the terms ASCAP was offering. In its objections to this aspect of Magistrate Judge Dolinger's Report, ASCAP markedly misstates our decision in *ABC/CBS*. Contrary to ASCAP's assertion, we did not rule there, as a matter of law, that because the rate court is available to set reasonable fees, no music user can claim that in reaching agreement with ASCAP, it had no alternative to paying an excessive license fee. Rather, we found that the two networks did not adduce sufficient evidence to explain why they did not invoke the assistance of the rate court, thereby defeating their attempt to complain that the rate court was unavailable to help them. 831 F.Supp. at 154–55. We specifically distinguished the facts in *ABC/CBS*, however, from the evidence adduced at the trial level in *Showtime* —evidence which the Second Circuit upheld as sufficient to support the trial court's finding that the applicants believed the rate court at that time to be ASCAP-friendly. *ABC/CBS*, 831 F.Supp. at 155.[21] In the instant case, there was similar evidence before Magistrate Judge Dolinger to support his finding that the local stations believed the rate court was not available to temper the arguably inflated royalties of the *Shenandoah* agreement. Specifically, Magistrate Judge Dolinger noted Judge Ryan's "early and clear endorsement [during the course of license fee negotiations] of the general approach espoused by ASCAP," Rep. at 75, and his statement that he would put the burden on the applicants to prove the unreasonableness of ASCAP's proposal.

■ Nor did Magistrate Judge Dolinger commit legal error in regarding this lack of meaningful alternatives and inequity in bargaining power as relevant considerations in diminishing the value of the *Shenandoah* license as a benchmark of reasonable royalties. *See Showtime*, 912 F.2d at 570; *ABC/CBS*, 831 F.Supp. at 145 (the rate court should consider claims that prior agreements resulted from a disparity in bargaining leverage when such agreements form the starting point of a rate-setting inquiry). Similarly, it was not legal error for the Magistrate to diminish the relevance of the *Shenandoah* agreement due to the stations' perceived lack of alternatives and disadvantageous bargaining position. *See Showtime*, 912 F.2d at 571 (the court may "receive and weigh evidence that [a licensee] thought it was paying a high price for the blanket license but was willing to do so because it felt it had no choice."). Therefore, Magistrate Judge Dolinger was entitled to conclude that, because there was an inequity in bargaining leverage which resulted in fees either perceived to be or actually greater than those that would be produced in a competitive market, the *Shenandoah* agreement should not be relied upon as a benchmark of reasonable royalties for the period of time it covered, and hence for subsequent periods. In so concluding, he weighed all of the evidence and found that, as a matter of fact, ASCAP did not meet its burden of showing that the fee it requested, a continuation of the terms of the *Shenandoah* agreement, was reasonable. No legal error contributed to this conclusion, and the finding itself is not clearly erroneous because it is adequately supported by the record.

■ Magistrate Judge Dolinger then had to determine a reasonable license fee. He correctly concluded that fairly negotiated prior agreements are the proper starting point from which to determine reasonable fees for subsequent periods. *ABC/CBS*, 831 F.Supp. at 145. Although Magistrate Judge Dolinger rejected the percentage-of-revenue formula of the *Shenandoah* agreement, he nonetheless chose as the base fee for the period at issue the actual fee paid in 1972 pursuant to that formula because he found the same to be reasonable. This finding is not clearly erroneous because there was ample record evidence to support it: (1) the stations were successful in their attempt to reduce the actual dollar burden as compared

---

21. Moreover, Magistrate Judge Dolinger noted in his Report that the networks enjoy greater bargaining leverage vis-a-vis ASCAP than do the local stations. This further distinguishes our above finding in *ABC/CBS*, and lends support to his factual finding that the stations suffer from an inequity in bargaining power due in part to the perceived lack of alternatives.

with the previous *Voice of Alabama* license, notwithstanding the fact that they were unsuccessful in their attempt to obtain a flat-fee license; (2) the stations chose to renew *Shenandoah* in 1972 for an additional five-year term after the 6% revenue growth projections upon which they based their decision to agree to *Shenandoah* proved relatively accurate for the first five years; and (3) the stations' negotiators viewed the dollar amount paid in 1972 as reasonable, even though they may have believed the percentage-of-revenue formula itself to be unreasonable. Magistrate Judge Dolinger's decision to use the 1972 fee, as opposed to the 1977 fee, as a base is also supported by the evidence in the record. While it is true that 1977 was the final year of the *Shenandoah* agreement, it was not unreasonable for Magistrate Judge Dolinger to find that the fees paid in 1973 through 1977 were not reasonable, thereby precluding use of any of those years as the base-fee year. The fact that the 6% revenue growth projections, upon which the stations relied in deciding to extend *Shenandoah* for five years in 1972, did not remain accurate for the period after 1972 supports the Magistrate's conclusion that the fees paid in 1977 were not believed to be reasonable by the stations. Moreover, the growth in the disparity in fees between the stations and the networks during this period further supports his conclusion that the fees in fact were not reasonable.

Magistrate Judge Dolinger then appropriately concluded that certain adjustments to the base figure were necessary to calculate fees for the period at issue so as to account for changes in the economic circumstances affecting the parties and changes in the nature and value of the rights at issue. *See ABC/CBS*, 831 F.Supp. at 145. However, he executed these adjustments in a different manner than we did in *ABC/CBS*. These differences are the heart of ASCAP's objections to the Magistrate's methodology.

The gravamen of ASCAP's objections is that Magistrate Judge Dolinger erred as a matter of law in not adopting the methodology that this Court used in *ABC/CBS* for those networks, particularly in adjusting the base fee for changes in the stations' gross revenues.[22] By not adjusting for this factor, ASCAP contends that the Magistrate Judge failed to give consideration to a legally relevant factor. ASCAP points out that by adjusting for annual changes in the CPI rather than by changes in gross revenue, the local stations would pay, in real dollars, the same fees in 1995 that they paid in 1972, an unfair result.

The O & Os respond that ASCAP is attempting "to obtain through the backdoor what the trial court said it was not entitled to obtain through the main entrance." O & O's Response at 6. They contend that Magistrate Judge Dolinger specifically found as unreasonable the actual dollar amount ASCAP now argues we should impose, and that ASCAP is attempting to circumvent a factual record that supported the Magistrate's conclusion by "artificially separating methodology from result, and hoping to persuade this Court to focus on the former and ignore the latter." *Id.* at 7. The O & Os strongly contest ASCAP's assertion that Magistrate Judge Dolinger failed to give consideration to the legally relevant factor of gross revenue, arguing that he specifically concluded that in this case, gross revenue was not an appropriate measure of reasonable fees and did not reflect the value of the blanket license. In response to ASCAP's argument that the Magistrate Judge erred because he kept fees constant, in real dollars, since 1972, the O & Os claim that ASCAP has made no showing why it should be entitled to an increase in fees. Specifically, they note that "music plays no more significant [a] role today in local television programming than it did twenty years ago," so that the value of the license to the O & Os now is the same as it was in 1972. Therefore, because Magistrate Judge Dolinger correctly concluded that the fee paid in 1972 was reasonable, that same fee, adjusted for inflation and the increase in

22. We note that Magistrate Judge Dolinger conducted the instant trial and issued the initial Report long before we issued the *ABC/CBS* opinion on August 11, 1993. Therefore, we obviously cannot fault him for not simply adopting the same methodology we devised for those two networks.

the number of local stations, is the reasonable fee for the period at issue.

■ We are presented with a problem at this point in our analysis because we agree, at least in part, with Magistrate Judge Dolinger and with several arguments of each of the parties. First, as we stated in *ABC/CBS* and reaffirm here, we believe that a license fee formula that relies *exclusively* on a percentage of gross revenue for the fee calculation is not a reasonable measure of the value of a music performance license because it does not account for changes in the value of the license by considering changes in the level of music use. *Id.* at 157–58. We therefore held that the base fee should be adjusted for changes in music use.

Similarly, Magistrate Judge Dolinger properly concluded that a percentage-of-revenue formula is not an appropriate measure of the value of a blanket license because the stations' revenues are not a direct function of the ASCAP music they use. As we did in *ABC/CBS*, Magistrate Judge Dolinger considered music use, although in a different manner, in adjusting the base fee he deemed reasonable. Specifically, he found that according to the data presented, the stations' music use had not significantly changed since 1972, thereby obviating the need for an adjustment for this factor. His factual conclusion is supported by the record, and it was not legal error for him to conclude therefrom that changes in music use were adequately considered.

Second, we do not retreat from our firmly held opinion that notwithstanding the above, it is appropriate to take into consideration the changes in gross revenue over time as *one* variable when adjusting a fee from a preset base because such an adjustment accurately accounts for a number of important factors, including not merely general inflation but industry-specific inflation, competition from alternative media such as cable and VCRs, the financial effect on the stations due to changes in their respective audience shares and viewership, and changes in the number of stations, with accurate compensation for differences between the new and established stations with respect to broadcast hours and audience. *Id.* at 158. We therefore emphatically reiterate our opinion that adjusting for changes in gross revenue as opposed to changes in the CPI is a much more precise method of accounting for changes in the economic circumstances affecting licensees over time. Because Magistrate Judge Dolinger chose, in contrast, to account for changing economic circumstances by adjusting the base fee merely by the CPI and by an arbitrary fraction of the increase in the number of stations under license, it can be argued that he erred.

■ However, we also are also confronted with a firm belief that, notwithstanding our disagreement with the manner in which Magistrate Judge Dolinger adjusted the base fee, the actual fee set by him is not unreasonable. By our calculations, which are necessarily mere approximations but are nonetheless believed to be reasonable estimates of the actual fees that would be produced pursuant to the Magistrate Judge's methodology, it appears that such fees would represent in the range of .50% to .59% of the local stations' gross revenues. The 1991 fees we adjudicated for the two networks in *ABC/CBS* represented approximately [redacted] of each network's gross revenues, and NBC, pursuant to agreement, paid 1992 fees of .44% of its gross revenues. In light of the fact that the local stations and the networks make similar use of ASCAP music and are comparably situated, the fees generated by Magistrate Judge Dolinger's formula are, if anything, unexplainably higher than the fees we set for the networks. Clearly we cannot accept ASCAP's contention that the local station fees set by the Magistrate Judge are unreasonably low, particularly when compared with the network fees.

Moreover, the Magistrate Judge quite carefully compared the actual dollar figure resulting from his fee formula and from the formula proposed by ASCAP against a number of benchmarks and found that ASCAP's proposal was unreasonable. Specifically, ASCAP's proposal would yield fees in the range of .71% of gross revenue, 210% of network fees for 1989, which represents an increase in fees since 1970 of 469% as compared with an increase for the networks of only 175%. Not even ASCAP's own expert could offer a cred-

ible rationale for such a disparity between the local stations and the networks, especially in light of the fact that the two make similar use of ASCAP music. Furthermore, Magistrate Judge Dolinger found that the fees produced pursuant to his formula would yield growth in per-station fees since 1972 comparable to that of the networks. All of this further supports his finding that AS-CAP's proposal was unreasonable and that the fee he set is reasonable.

■ We reject ASCAP's attempt to have us look only to fee-setting methodology while ignoring the actual dollar figure that results therefrom. Section IX of the Consent Decree imposes upon us the duty to set a reasonable fee, and any approach that completely ignores the actual fee burden resulting from a particular formula fails properly to consider the reasonableness of the fee itself.[23] As the Second Circuit stated in *Showtime*, fair value is ultimately a factual determination. 912 F.2d at 569. We are mindful that the Court also stated that we must consider legal errors contributing to that factual determination. However, we are not prepared to say that Magistrate Judge Dolinger committed legal error when, although not adjusting the reasonable base fee by changes in gross revenue, his finding as to the reasonableness of the ultimate fee is not clearly erroneous.[24] In other words, while we disagree with Magistrate Judge Dolinger's methodology and believe an adjustment based on changes in gross revenue as opposed to the Consumer Price Index is the better approach, we nonetheless affirm his finding as to the actual fee to be imposed because that fee is not unreasonable. Therefore, the blanket license fee for the O & Os for the year 1995, the only year remaining at issue, is to be calculated pursuant to the methodology devised by Magistrate Judge Dolinger in his Report dated February 26, 1993, and the rulings and stipulations related thereto.

## B. The Per-Program License

### 1. The Decision Not To Rely on Prior Agreements

ASCAP's first objection to Magistrate Judge Dolinger's per-program license decision is that he erred in not relying on past per-program license agreements as benchmarks of reasonable royalties for such license rates today. Specifically, ASCAP argues that Magistrate Judge Dolinger erroneously ignored the entire licensing history of the radio and television broadcast industries with both ASCAP and BMI. ASCAP contends that every per-program license in the past 50 years between itself and the two industries has been based on a percentage-of-program-revenue, and has resulted in ratios between blanket and per-program fees of approximately 4:1. Moreover, prior licenses between BMI and the two industries have yielded ratios between per-program and blanket licenses of 2.4:1 to 5:1, with the television per-program licenses resulting in average ratios of about 4:1. ASCAP claims that this licensing history should not have been ignored because prior negotiated radio and television licenses are the best benchmarks of reasonable per-program rates today.

■ We agree with ASCAP that prior negotiated arms-length agreements are the best starting point for determining reasonable license fees for subsequent periods. *See ABC/CBS*, 831 F.Supp. at 145. However, we reiterate that it is also necessary to examine those prior agreements so as to determine

---

23. This is especially so in the instant case. Specifically, if we were to remand the proceeding to Magistrate Judge Dolinger with the direction that he calculate the blanket license fee pursuant to our stated methodology in *ABC/CBS*, the fee that would result from adjusting the 1972 base fee for changes in gross revenue would be unreasonably high, in fact even higher than that for which ASCAP argued at trial and the Magistrate found unreasonable.

24. We note here that Magistrate Judge Dolinger also adjusted the base fee by one-half the annual

percentage increase in the number of local stations under license. This adjustment factor accounts for increased viewership to a certain extent, and properly takes into account the fact that as the number of licensees increases, the aggregate license fee should increase. His factual determination to adjust by one-half the annual percentage change in the number of licensed stations, as opposed to a *pro rata* adjustment, is supported by the factual record. *See* discussion *supra* pp. 184–85.

whether anomalous conditions impacted them or whether they were the product of a disparity in bargaining leverage so as to render them unreliable as benchmarks for subsequent periods. *Id.* Magistrate Judge Dolinger appropriately evaluated the prior agreements at issue in light of these factors. In so doing, he made the factual finding that reliance on those agreements, for several reasons, was not warranted. These findings have ample support in the record and are not clearly erroneous.

■ First, he properly rejected ASCAP's argument that because prior agreements contained per-program rates that made the license impractical for most stations, the Consent Decree permits such a structure. It is obvious that the parties at bar were free to set any mutually agreeable terms for the prior license agreements, regardless of the mandates of the Consent Decree. It follows that such negotiated terms do not define the rights accorded to music users under the Decree. Therefore, we cannot accept ASCAP's argument that prior acceptance of certain terms constitutes a binding concession by the stations that such terms are mandated by or even consistent with the Consent Decree's provisions. Magistrate Judge Dolinger appropriately noted this in rejecting this aspect of ASCAP's argument in support of its position that the prior agreements should be relied upon for the terms of the license for the period at issue.

Second, Magistrate Judge Dolinger was entitled to find based on the evidence presented that distinctive conditions impacted the prior radio agreements and the *Shenandoah* agreement so that it is not appropriate to rely on them as benchmarks of reasonable royalties. Most importantly, the evidence supports his conclusion that neither the radio

nor the local station negotiators bargained vigorously for an acceptable per-program rate. Rather, the radio negotiators accepted higher per-program fees because they were not interested in that form of license. And the *Shenandoah* negotiators accepted higher per-program fees because, after unsuccessful negotiation for lower rates, they chose instead to use the per-program rate as a bargaining chip for less expensive blanket license fees.[25] This evidence supports Magistrate Judge Dolinger's finding that the prior agreements are not indicative of a competitive market outcome.

Third, Magistrate Judge Dolinger was entitled to credit the record evidence in finding that it is likely that the prior agreements, contrary to ASCAP's assertion, did not yield ratios between *actual* blanket and per-program license fees of 4:1. While he correctly noted that in terms of the percentage rates set for the two licenses, the ratios were in the range of 4:1, he also found that due to the fact that the percentages for the two licenses were applied to different bases, the actual fees generated therefrom likely resulted in ratios somewhat less than 4:1. Therefore, he concluded that it was likely that the 4:1 ratio ASCAP cited in support both of its proposal and of relying on these past agreements was overstated. This finding is not clearly erroneous and lends support to his conclusion that the prior agreements do not show that a 4:1 ratio is reasonable.[26]

Fourth, in the background of all of this is Magistrate Judge Dolinger's conclusion, discussed extensively in the blanket license portions of both his and the instant opinion, that ASCAP enjoyed greater bargaining leverage than the O & Os, thereby undermining prior agreements as indicative of a competitive market outcome. Moreover, Magistrate

---

25. ASCAP argues that if the per-program fees are to be discounted on this basis, then the prior-negotiated blanket fees should have been deemed by Magistrate Judge Dolinger as lower than reasonable. Because Magistrate Judge Dolinger concluded that *both* the blanket and per-program fees were too high, the argument goes, he erred.

Although superficially attractive, ASCAP's argument is unpersuasive. It is entirely possible that the stations were able to get reduced blanket license fees in exchange for increased per-program fees, while still being subject to unreason-

ably high fees on both bases due to ASCAP's market power.

26. Even if Magistrate Judge Dolinger's conclusion were clearly erroneous, there is still justification for his not relying on the past agreements as benchmarks of reasonable royalties, such as the fact that the stations, rather than pressing for acceptable per-program rates, acquiesced to higher rates as leverage to obtain better blanket license fees.

Judge Dolinger specifically found that the stations did not view the per-program license as a reasonable alternative to a blanket license. Again, these factual findings have ample support in the record.

Lastly, Magistrate Judge Dolinger did not commit legal error in regarding the combination of the four factors discussed above—especially the existence of circumstances peculiar to those agreements and the inequality in bargaining power—as relevant considerations in diminishing the value of the prior negotiated agreements as benchmarks of reasonable royalties. *See Showtime*, 912 F.2d at 570; *ABC/CBS*, 831 F.Supp. at 145, 149.[27]

In sum, magistrate Judge Dolinger did not err in concluding that the prior agreements at issue are not reliable benchmarks of reasonable royalties for the per-program license fee for the periods of time they covered, and hence for subsequent periods. No legal error contributed to this conclusion, and the finding itself is not clearly erroneous because there is substantial support for it in the factual record.

### 2. The Interpretation of "Genuine Choice"

■ Magistrate Judge Dolinger first made the factual finding that "ASCAP's per-program proposal is designed to further its aim of keeping the per-program license technically available but practically illusory for virtually all stations." Rep. at 148. This finding has ample support in the factual record. Specifically, Magistrate Judge Dolinger was entitled to credit the totality of the following evidence to support his conclusion: (1) ASCAP's stated fear that licensees would seek to minimize use of ASCAP music in their programming by taking an ASCAP per-program license and a BMI blanket license; (2) ASCAP's intuitively reasonable desire to keep the per-program license impractical due to the fact that its availability provides competition to the more expensive blanket license and a bridge to source and direct licensing; (3) the series of events evidencing ASCAP's resistance to offering the per-program license at reasonable rates; and (4) the fact that, under ASCAP's proposal, if a station were to take a per-program license and attempt to pay the same fees for it as it would for a blanket license, the station would have to clear otherwise unlicensed ASCAP music from programming that represents 75% of its revenues from non-network programming and from virtually all of the ads, promos, and PSAs it runs daily—a prohibitively expensive and perhaps impossible task. These findings are not clearly erroneous and support the Magistrate Judge's further factual finding that ASCAP's proposal is aimed at making the per-program option available only to the anomalous station.[28]

27. ASCAP contends that Magistrate Judge Dolinger's formula is unsupported by the Consent Decree because it encourages widespread use of the wasteful and inefficient per-program license and does not "correspond[ ] with the long-held views of both ASCAP and the broadcasters as to the proper role to be served by the per-program license under the Consent Decree," as evidenced by prior licensing agreements—agreements which "provide significant insight into how the businessmen in this industry believed the fee-saving features of the per program license should be balanced against the inefficiencies it inevitably produces." ASCAP's Objections at 50, 30.

Again, although we recognize that prior agreements are the best starting point for determining reasonable fees for subsequent periods, ASCAP's argument ignores the factual finding made by Magistrate Judge Dolinger that the prior agreements are not reliable indicators of reasonable fees, and do not signal what the stations' negotiators believed was the proper role to be served by the per-program license.

28. ASCAP claims that, contrary to Magistrate Judge Dolinger's conclusion, its 4:1 proposal would not make the per-program license impractical for most stations. Specifically, ASCAP cites its 64–station study to support its contention that many stations are "within striking distance" of the 25% threshold for saving money under its proposal. That is, if half of the unidentified music were deemed to be ASCAP music, then 6 of the 64 stations could, without additional effort, save money by choosing the per-program license because these 6 derived less than 25% of their revenue from programs using ASCAP music. Moreover, 18 stations were close to the 25% threshold because they derived less than 35% of their revenue from programs using ASCAP music.

Even if we were to credit the reliability of ASCAP's study, which Magistrate Judge Dolinger did not, it still would not support ASCAP's assertion. Specifically, the analysis does not take account of the administrative burden entailed in operating pursuant to the per-program license, a burden that ASCAP argues should be borne entirely by the station opting for the license. This would significantly decrease the number of stations that would be able to operate under the

After so concluding, Magistrate Judge Dolinger then addressed the question of whether this is consistent with the per-program provisions of the Consent Decree, specifically the requirement that ASCAP price the blanket and per-program licenses in such a way so as to afford licensees a genuine choice between the two. Magistrate Judge Dolinger, after thoroughly reviewing the history of the 1950 Amendments to the Decree, concluded that "it is doubtful that the 'genuine choice' requirement is satisfied by a [ ] rate structure that makes the per-program license economically feasible for only a handful of stations, if any ... [because] such an approach would trivialize what was plainly not intended to be a trivial set of provisions." Rep. at 155. We believe he did not commit legal error in reaching this conclusion.

While we are mindful of the difficulty a court faces in interpreting ambiguous provisions of a Consent Decree over which it has jurisdiction, we nonetheless agree with Magistrate Judge Dolinger's interpretation of the "genuine choice" provision of the Decree at issue as based upon his review of the facts leading to the adoption of the provision. Specifically, he found that the Justice Department went to great lengths to strengthen the per-program aspects of the Consent Decree when it was amended in 1950. These efforts were driven in part by complaints by radio broadcasters that ASCAP continually attempted, between 1941 and 1950, to require all radio stations to take blanket rather than per-program licenses. Indeed, the 1950 amendments were successful in fortifying the per-program provisions: (1) Section VII(B) requires ASCAP to offer a per-program li-

cense to any broadcaster who so requests; (2) Section VII(C) prohibits ASCAP from "requiring or influencing the prospective licensee to negotiate for a blanket license prior to negotiating for a per-program license;" and (3) Section VIII requires ASCAP to avoid discrimination between the fees fixed for blanket and per-program licenses which would have the effect of depriving licensees of a genuine choice between the two licenses.

Moreover, ASCAP, in seeking to have the 1950 amendments condoned by the court, touted the per-program provisions as "assur[ing] to users of music complete freedom of choice in obtaining a license to perform some, all or any of the musical compositions in the ASCAP repertory at a fair and non-discriminatory rate." Rep. at 153 (quoting *United States v. ASCAP*, 782 F.Supp. at 812). Consequently, it is not surprising that the Department of Justice disputes ASCAP's contention that the per-program provisions of the Consent Decree were not intended to apply to bulk users of music. *See* Rep. at 154. In addition, it is not surprising that in their submissions to the court in support of the 1950 amendments, neither the Justice Department nor ASCAP suggested that the per-program license alternative was to be limited to such a small number of licensees.

We find no error in Magistrate Judge Dolinger's concluding, from all of the above, that a license fee structure that makes the per-program license an economically viable option for only a few of the close to 1000 local stations tends to "trivialize what was what was plainly not intended to be a trivial set of provisions." Rep. at 155. Consequently, we do not find error in his conclusion that AS-CAP's assertion, i.e, that the per-program

per-program license at a cost equivalent to that of the blanket license. Furthermore, the above numbers estimated by ASCAP are based on the assumption that 50% of the unreported or unidentified music was ASCAP music. We have no way of knowing whether such a percentage is accurate, and in any event, if the percentage were greater than 50%, ASCAP does not report how many stations could then benefit from the per-program license. In light of the fact that Magistrate Judge Dolinger estimated that ASCAP music is used in somewhat less than 81% of locally-produced programming, *see supra* note 17, it seems that the 50% estimation may be understated. Lastly, ASCAP's study, as noted by

Magistrate Judge Dolinger, was incomplete in that, of the stations that responded to the survey questions, some failed to report music use in locally-produced programs, and most others reported lots of unidentified music in locally-produced programming. Magistrate Judge Dolinger concluded from this that "ASCAP offer[ed] no meaningful evidence as to how many stations might be able to take advantage of the per-program license under its proposal." Rep. at 155 n. 97. Magistrate Judge Dolinger was entitled to hear and weigh the evidence, and we cannot say that his finding that the study was not reliable is clearly erroneous.

option was to be made available only to the few broadcasters making very little use of otherwise unlicensed ASCAP music, is simply wrong. His findings of fact supporting these conclusions are not clearly erroneous; nor is his conclusion based on these findings error. We note that the per-program option has consistently been found to be one of the saving graces of ASCAP's blanket licensing regime as against antitrust attacks. *See, e.g., Buffalo Broadcasting Co., Inc. v. ASCAP,* 744 F.2d 917 (2d Cir.1984). To condone a pricing structure that makes the per-program license illusory for all but a few stations would serve to nullify the necessary protection from restraint of trade that the per-program license offers. This clearly cannot be what the Justice Department and the court intended in 1950 when they buttressed the per-program provisions of the Consent Decree.

### 3. The Ratio Between Blanket and Per-Program Fees

■ After declining to rely upon prior agreements as benchmarks of reasonable per-program rates, and after deciding that a fee structure that makes the per-program license available to only a few local stations is not consistent with the "genuine choice" provision of the Consent Decree, Magistrate Judge Dolinger turned to devising his own fee structure. To do so, he had to determine where, along the continuum of the 1:1 and 4:1 ratios as proposed by the stations and AS-CAP, respectively, the Consent Decree's requirement of a "genuine choice" falls. He correctly noted that due to the generality of the "genuine choice" language, the Consent Decree offers no specific answer to this question. Therefore, he was entitled to determine the intent of the parties to the Consent Decree from extrinsic evidence, findings which we will accept unless they are clearly erroneous. *See South v. Rowe,* 759 F.2d 610 (7th Cir.1985).

■ In determining this intent, Magistrate Judge Dolinger looked to (1) the history of the 1950 amendments to the Consent Decree, (2) the fact that one purpose the per-program license was intended to serve was as a check on ASCAP's exercise of its market power in favor of its preference for the blanket license, and (3) the fact that he previously interpreted the "genuine choice" provision as to not be satisfied by a licensing regime which makes the per-program option a practical alternative for only a few stations. From this, he concluded that the "price [of the per-program license] should be set in such a way that, when compared to the blanket license fee, its use is economically feasible for a *significant* segment of the industry either under their current programming practices or under programming policies that it would be feasible for the stations to adopt." Rep. at 172 (emphasis added). He noted that affording a significant segment of the industry the option to take a per-program license would serve the "Decree goal of price stabilization in the face of ASCAP's recognized market power." Rep. at 172–73.

He also recognized the need to consider additional, competing factors in devising the appropriate fee structure, such as ensuring a fair return to ASCAP and its members and avoiding undue market inefficiencies and music use disincentives. After balancing all of these considerations and noting that no precise formula could be devised from the evidence to account for them, he concluded that the "genuine choice" mandate would be satisfied by a pricing structure which would enable the *typical* local station to operate pursuant to a per-program license at a cost roughly equivalent to that of a blanket license, exclusive of the administrative expenses incurred by the station and ASCAP in operating under the per-program license— expenses which would be defrayed by the licensee.

Magistrate Judge Dolinger's factual findings as to the intent of the parties with respect to the meaning of "genuine choice" are fully supported by the record and are therefore not clearly erroneous. Because the Decree language is ambiguous, these findings are controlling. While we cannot say what precise structure, or fee relationship between the two forms of licenses, follows from the legally correct finding that a significant segment of the industry should be given an economically feasible per-program option, we nonetheless agree with the basic principle

which informed the Magistrate Judge's decision. We accordingly affirm Magistrate Judge Dolinger's legal conclusion that the typical station should be able to choose between a per-program license and a blanket license of roughly equivalent costs, exclusive of the administrative expenses entailed in tracking, reporting, and verifying music use under the per-program license.

■ It is important to note as well, however, that these administrative expenses will force the typical station, if it wants the per-program license to remain less expensive than the blanket license, either to clear some ASCAP music from its programming or to obtain source or direct licensing for some music.[29] This fact properly accounts for the countervailing considerations discussed above in that it provides incentive for the typical station to alter somewhat its music use so as to be able to benefit from the per-program alternative. In other words, the administrative expense burden serves as a disincentive for the typical station to choose the per-program license, unless the station decreases its ASCAP music use or obtains source or direct licensing for a portion of its programming. This should discourage inefficient use of the per-program license and, as Magistrate Judge Dolinger found, should avoid an unduly burdensome rush of stations choosing the per-program alternative.

■ In devising a formula in accordance with the basic principle of cost equivalence for the typical station, Magistrate Judge Dolinger made the factual finding that the typical station uses otherwise uncleared ASCAP music in approximately 75% of its locally-produced and syndicated programming. To make the two licenses equal in cost for the typical station, therefore, he calculated that the per-program fee ceiling, i.e., the per-program license fee for a station who uses music in all of its non-network programs, should be 133% of the station's blanket license fee. While the 75% figure that he approximated is somewhat open to question in that there was not statistically reliable evidence of music use on locally-produced programs,[30] we nonetheless do not believe this finding is clearly erroneous. Magistrate Judge Dolinger made an educated estimate that appears reasonable; in any event, as noted earlier, we are not attempting here to be, nor is it likely possible to be, precisely correct. Therefore, we affirm Magistrate Judge Dolinger's ruling that the basic per-program license fee ceiling, to cover music use in locally-produced and syndicated programming, and excluding administrative costs and the incidental use fee to be discussed below, should be 133% of the blanket license fee.[31]

### 4. The Incidental Use Fee

Magistrate Judge Dolinger next devised a fee, which he called the incidental-use fee, to cover music use in ads, promos, PSAs, and producer's logos. He concluded that AS-CAP's proposal with respect to the treatment of these music uses was not acceptable because requiring the local stations to identify and report music use in the hundreds of ads, promos, and PSAs each runs daily would unduly complicate the administration of the

29. Neither party objects to Magistrate Judge Dolinger's conclusion that an increment to the basic per-program fee is necessary to reimburse AS-CAP for the reasonable expenses it incurs in administering the per-program license. Nor does either party object to his decision to set that fee at 7% of the otherwise applicable blanket license fee. Magistrate Judge Dolinger did not err in concluding that such reimbursement is appropriate. The per-program fee should reflect the operating expense incurred under the license, just as a competitive market price would reflect the cost of production. Nor is his factual conclusion as to the amount of the reimbursement clearly erroneous. His finding that 7% of a station's otherwise applicable blanket license fee adequately compensates ASCAP for its reasonable expenses is supported by the factual record.

Lastly, we agree with his legal conclusion that a set fee should be set as opposed to simply delineating the expense categories that are compensable. Such a structure serves the goals of notice and finality, and does not deprive ASCAP of its right to be reimbursed.

30. See supra n. 17.

31. We note, however, that in light of the rulings we make herein with respect to the incidental-use fee and the right to a revenue-based fee, this figure may have to be recalculated upon remand so as to remedy the errors discussed herein while still being guided by this general principle and factual finding.

per-program license, would add expense beyond that which both the stations and AS-CAP should bear in relation to the value of such music use, would likely be impossible due to the fact that ad agencies often do not provide cue sheets for music used in ads,[32] and would possibly make the per-program license too expensive for most stations due to the administrative burden of reporting such music use.

In light of these factors and the fact that one goal in pricing the per-program license is to minimize unnecessary inefficiency, he decided to impose an incidental use fee to cover ads, promos, PSAs and logos—a separate fee for which it would not be necessary to report each such music use. He set this fee at 7.5% of the per-program fee ceiling, or 10% of the station's blanket license fee, a figure which was derived from the fact that ASCAP distributes 7.2% of its revenues on account of music use in ads, promos, and PSAs, and a .3% increase to account for logos.

■■■■ ASCAP strongly objects to Magistrate Judge Dolinger's creation of the incidental-use fee. Specifically, ASCAP argues that the incidental-use fee violates the Consent Decree because it is, in effect, a mini blanket license for commercials, promos, PSAs, and logos—a type of license not contemplated by the Decree. ASCAP cites both *Shenandoah*, 208 F.Supp. 896 (S.D.N.Y.1962)

and *NBC*, 1971 Trade Cas. (CCH) ¶ 73,491 (S.D.N.Y.1970) in support of its assertion.

In *Shenandoah*, Judge Ryan refused to order ASCAP to offer the local television stations a mini blanket license to cover only locally-produced programs while excluding syndicated programs. Judge Ryan held that ASCAP had no obligation under the Consent Decree to offer such a license, nor did the Court have the power to compel it, because the Consent Decree neither "explicitly [n]or impliedly requir[ed] ASCAP to issue the type of license requested." 208 F.Supp. at 897, *aff'd* 331 F.2d 117 (2d Cir.1964). In *NBC*, Judge Ryan, relying on *Shenandoah*, again refused to compel ASCAP to offer a license limited to a certain number of compositions in the ASCAP repertory because the Consent Decree did not so require. ASCAP argues that the incidental-use fee is analogous to the licenses requested and denied in *Shenandoah* and *NBC* in that it is a composite license—neither a true blanket license nor a true per-program license—because it is a license that covers only a portion of the programming day yet contains the non-reporting and unlimited music use features of the blanket license.

We agree with ASCAP that the incidental-use fee portion of the per-program fee structure devised by Magistrate Judge Dolinger exceeds this Court's authority and therefore violates the Consent Decree.[33] A blanket

**32.** We do not agree with this finding by Magistrate Judge Dolinger. While current practice may be that advertising agencies do not typically provide cue sheets for their ads, we see nothing to prevent them from so doing. Moreover, if such music use cannot be identified with some effort by both ASCAP and the local station at issue, the rules Magistrate Judge Dolinger devised with respect to the allocation of the burden for unidentified music would remedy the problems occasioned thereby.

**33.** The O & Os argue that because ASCAP has agreed, in prior negotiated licenses, to a fee structure similar to the incidental-use fee, they cannot be heard to complain now that this fee violates the Consent Decree. This argument is unpersuasive because as noted several times previously, the parties at issue are free to negotiate whatever terms they wish, irrespective of the mandates of the Consent Decree, and acquiescence in such negotiated terms does not signal concession that the rate court's imposition of such terms is mandated or authorized by the Decree.

The O & Os also claim that *Shenandoah* and *NBC*, in their rejection of certain fee structures requested by applicants, are inapposite to the present case. They argue that in those two cases, applicants sought licenses to cover only a portion of the programming day, whereas here, the issue before magistrate Judge Dolinger was "the reasonable pricing and administration of a per program license insofar as it covers performances of the kind that generate minimal royalty credits in ASCAP's distribution system ... and the rate court's power to determine a reasonable price structure for that license [which] entails the power to calibrate fees and reporting obligations according to the relative value of the performances subject to license." O & Os' Response at 73. This argument sounds similar to that advanced by the local stations, and rejected by Judge Ryan, in *Shenandoah*. Just because a fee structure may be reasonable does not give this Court the authority to impose it. As stated in *Shenandoah*, if the applicants believe the license they request furthers the antitrust goals of the Consent Decree, they are free to attempt to per-

license is a license which enables the music user, for a pre-determined fee, to use as much or as little ASCAP music in its programming as it wishes without incurring copyright liability, without reporting or even keeping track of such music use. A per-program license, on the other hand, enables a music user to use as much ASCAP music as it wishes, but requires the user to report music use so that ASCAP can determine which programs trigger a fee. The incidental-use fee at issue is neither of the above. We are not persuaded by Magistrate Judge Dolinger's attempt to distinguish the incidental-use fee from the licenses at issue in *Shenandoah* and *NBC*. Specifically, he stated that the incidental-use fee is indeed a per-program license—one which simply sets different rates for different types of programs. While this argument sounds attractive, it cannot withstand analysis. If each station were required to monitor and report music use in ads, promos, PSAs, and logos, and pay a fee only when such spots contained otherwise uncleared ASCAP music, this would be a true per-program license, and a different rate for such uses as compared with the rate for the use of music on a program itself would not be inconsistent with the Decree. As stated above, however, the incidental-use fee devised by Magistrate Judge Dolinger is not based on such a structure because the same fee is paid regardless of the presence or absence of ASCAP music. Therefore, the incidental use fee devised by Magistrate Judge Dolinger is vacated.

■ We rule that music use in ads, promos, and PSAs should be treated similarly to the manner in which music in programs is treated, i.e., as if each spot were a program in itself. We therefore agree with Magistrate Judge Dolinger's rejection of ASCAP's proposal to treat music use in ads, promos, and PSAs as the equivalent of music use in the program in or before which such ads

appear. Conceptually, and contrary to ASCAP's assertion, these spots are not part of the program itself.

The rules for the treatment of these different spots should be as follows. If an ad containing ASCAP music precedes a *non-network* program with or without ASCAP music, or if an ad containing ASCAP music is aired within a *non-network* program that does not contain ASCAP music, a fee will be triggered based on the revenue of that ad alone.[34] If an ad containing ASCAP music is aired within a *non-network* program which also contains ASCAP music, a fee based on the revenue of the entire program will be payable; however, no separate fee based on the revenue of the ad will be payable because that would constitute double-counting. If an ad containing ASCAP music precedes or comes within a *network* program, a fee will be triggered based on the revenue of the ad alone.[35]

Promos used similarly to ads will trigger a fee based on the revenue that would have been generated had the spot been a commercial one. *See* Consent Decree Section VII(B)(2). We choose to treat ads and promos in the same manner, notwithstanding the fact that promos do not generate revenue in the same way ads do, because both are, in essence, commercial uses of music.

■ We are left with the treatment of PSAs and logos. We conclude that music use on PSAs should not generate a fee at all. First, in light of the fact that the per-program license is revenue-based, it is not necessarily appropriate to charge a local station a fee for a music use which has no commercial purpose and produces no revenue. Second, charging a fee for such a use would serve as a disincentive for the stations to air PSAs which contain otherwise uncleared ASCAP music. Because PSAs are a socially

suade either ASCAP or the Justice Department, parties to the Decree, to move this Court to amend the Decree. *See Shenandoah*, 208 F.Supp. at 898.

**34.** Note that we do not adopt ASCAP's proposal that such music uses trigger fees as if the music use were within the program itself, rather than merely within the ad.

**35.** Note that we do not adopt ASCAP's proposal that if one ad containing ASCAP music, in a set of ads, is aired prior to or during a network program, a fee should be triggered based on the revenue from the set of ads, regardless of the presence or absence of ASCAP music in the other ads.

desirable vehicle for imparting important messages in the public interest, we do not think it proper to impose a fee burden that would discourage use of such spots, especially in light of the fact the music use in these spots is likely minimal.

 With respect to logos, we also do not think that they are an integral part of the program to which they are connected, notwithstanding the fact that they are contained within the program. However, we cannot devise a fee for these uses as if they were a program in themselves, as we did for ads and promos, because there is no revenue associated with the logo itself on which to base a per-program fee. Therefore, we think that a fee should be generated based on the revenue of the program to which the logo is connected, but that the rate for such a use should be lower than the rate charged for music use in the program itself.[36]

### 5. The Right To a Revenue–Based Fee

 One of ASCAP's strongest objections to Magistrate Judge Dolinger's Report is that he erred because he did not honor ASCAP's "absolute right," pursuant to Section VII(B) of the Consent Decree,[37] to a per-program fee based on a percentage of revenue from programs using ASCAP music. Rather, Magistrate Judge Dolinger set a flat per-program fee ceiling, that is, 150% of the flat blanket license fee, and after recognizing

ASCAP's right to a percent-of-revenue fee, simply stated that the flat fee, once determined, could be converted into a percentage rate. See Rep. at 120, 178 n. 113, 200. ASCAP contends that this is error because the fee methodology is not truly revenue-based; the fee is not calculated by multiplying station revenues by a specified percentage. Therefore, as the station's revenue changes, the fee, rather than changing, stays the same,[38] and the percent-of-revenue rate, rather than staying the same, changes.

The O & Os argue that Magistrate Judge Dolinger's fee methodology is indeed revenue-based because the per-program fee is a direct function of, and specifically derives from, a station's revenues from non-network programs with ASCAP music. That is, a station first calculates its per-program fee ceiling (the amount of its per-program fee if all of its non-network programs contain ASCAP music) by multiplying its otherwise applicable blanket license fee by 140%. The station next determines the *percentage of its revenues* attributable to programs containing uncleared ASCAP music. To calculate its actual per-program fee, the station multiplies its per-program fee ceiling by that percentage, and adds 10% of its blanket license fee as the incidental-use fee. Under this formula, the argument goes, the percentage of revenues attributable to programs containing ASCAP music determines the per-program fee. While this is obviously true, it is totally

---

**36.** ASCAP argues that it is error to devise a fee for logos at a different rate than the fee for other music uses because the per-program license should charge a single, average rate for all programming containing ASCAP music, regardless of the type of music use in each program. If a different rate were to be charged for music use in ads, etc., the argument goes, then different rates should be charged, e.g., for feature, theme, and background performances. ASCAP argues that the presence of different rates defeats the purpose of the average-rate structure—a structure which decreases the administrative burden of the per-program license by eliminating the need to report music use by type.

We are mindful of ASCAP's argument insofar as it is concerned with the administrative burden associated with having to differentiate among types of music use. However, because we impose this burden only for music use in logos, we do not believe the increased administrative expense will be onerous.

**37.** Section VII(B) provides:

> Defendant ASCAP ... is hereby ordered and directed to issue to any unlicensed radio or television broadcaster ... per program licenses, the fee for which (1) in the case of commercial programs, is, at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the sum paid by the sponsor of such program for the use of the broadcasting or telecasting facilities of such radio or television broadcaster."

**38.** Unless, of course, the *percentage* of revenue derived from programs using ASCAP music changes, in which case, the fee will also change because the reduction from the per-program fee ceiling is based on the percent of total station revenue derived from programs not using ASCAP music. See *supra* note 20 and *infra* p. 206.

irrelevant. What the Consent Decree requires is a per-program fee which is a specific percentage of the revenues derived from programs containing ASCAP music, not a percentage of the *total* revenues which represents the ratio between the revenues derived from programs containing ASCAP music and the revenues from those which do not. There is no correlation between the two measures; one may increase while the other declines.

The O & Os argue in the alternative that even if the Decree entitles ASCAP literally to a revenue-based fee which represents a specified percentage of revenues from programs containing ASCAP music, Magistrate Judge Dolinger's methodology can be modified by a mathematical conversion so as to fulfil such a requirement. That is, "rather than multiplying a station's maximum per-program license fee by the percentage of its revenues derived from non-network programs (as the trial court's methodology provides), the station can simply divide its maximum per-program license fee by its non-network revenues, which will yield a percentage which may then be applied to the revenues the station earns from its programs with ASCAP music." O & Os' Response at 77. That ingenious artifice is equally unconvincing. The resulting fee is not a predetermined percentage of revenues from ASCAP-music-containing programs but a percentage which varies in proportion to the revenues from *other* programs.

We are therefore not persuaded that either rationalization fulfills the requirements of the Consent Decree. Section VII(B)(1) affords ASCAP the right to grant a per-program license, "the fee for which ... is ... based upon the payment of a *percentage of the sum paid by the sponsor of such program* for the use of the broadcasting ... facilities." (emphasis added). As stated above, we believe the clear meaning of this provision is that ASCAP is entitled to a fee which is calculated as a specified percentage of the revenue derived from the program in question. Magistrate Judge Dolinger set a flat fee but, in recognition of the Consent Decree's requirement, at ASCAP's option, of a percentage-of-program-revenue fee for a per-program li-

cense, went through the added step of computing the percentage of revenue that the flat fee represented. We agree with ASCAP that such a conversion is mere window-dressing. That percentage of revenue will change as the revenue changes. We therefore conclude that the per-program fee set by Magistrate Judge Dolinger is not in conformity with the Consent Decree and must be vacated.

### 6. *Fair Uses*

■■ ASCAP objects to Magistrate Judge Dolinger's decision that "fair uses," e.g., ambient music incidentally picked up during news and sports broadcasts, should neither be included in the incidental-use fee category nor trigger a full per-program fee. ASCAP contends that the concept of "fair use," a defense to a copyright infringement action, should not define the scope of the per-program license, and that leaving the issue to the parties to litigate or negotiate simply increases the inefficiency of the license and invites waste. ASCAP argues that the per-program license should include all uses of ASCAP music because the Consent Decree "does not compel ASCAP to provide an exclusion for performances of ASCAP compositions that might be considered 'fair use' ... so this Court has no authority to compel such a license." ASCAP's Reply at 24.

We simply do not agree with ASCAP's argument. While it is true that the parties may disagree as to when a certain music use is a fair use, thereby necessitating litigation or extended negotiation, it is also true that ASCAP has no right to demand royalty payments for the use of music that is exempt from copyright liability. The purpose of the licenses ASCAP offers is to grant the licensee the right to use music in its repertory, for a price, without incurring copyright liability. If a certain music use does not trigger the rights of the copyright holder, then ASCAP cannot be heard to complain that such use is not licensed. Therefore, we affirm Magistrate Judge Dolinger's decision to exclude fair uses from the scope of the license, and to leave the parties to determine when such a use has occurred.

**208**

### 7. The Remedy

Because it appears that the record does not contain a sufficient evidentiary basis to enable this Court to set reasonable fees for the types of licenses as to which the fees set by Magistrate Judge Dolinger have been vacated, we remand to Magistrate Judge Dolinger to devise fee structures consistent with the rulings in this decision.

### CONCLUSION

For the foregoing reasons, the blanket license fee for the O & Os for 1995, the only year remaining at issue, is to be calculated pursuant to the methodology devised by Magistrate Judge Dolinger in both his Report dated February 26, 1993 and the rulings and stipulations related thereto.

The per-program license fee devised by Magistrate Judge Dolinger for the O & Os for 1995 is vacated, and the case is remanded to him for further proceedings consistent with the principles and rulings herein.[39]

### SO ORDERED.

---

**39.** In addition, we affirm the other rulings made by Magistrate Judge Dolinger in his Report to which neither party has objected.

 Lastly, we are mindful of the fact that this opinion deals only with the 20 O & Os, not the entire local television station industry that is currently the subject of Second Circuit review. However, the Magistrate's 226-page opinion set

fees in the same manner for all stations, and we presume that at some point, the Second Circuit will reconcile any differences that may result from the unusual bifurcated review process occasioned by the separate referrals to Magistrate Judge Dolinger as to the *Buffalo* applicants and the O & Os.